(804 P.2d 1012)

No. 62,344

BILLY K SNODGRASS AND AUTOMOBILE INSURANCE COMPANY OF
HARTFORD, CONNECTICUT, *Appellees/Cross-Appellants*, v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,
*Appellant.*

Opin-
ion filed January 18, 1991.

*Robert L. Howard* and *Stephen M. Kerwick*, of Foulston & Siefkin, of Wichita, for appellant.

*Jacob S. Graybill* and *J. B. Craig*, of Moore, Graybill & Craig, of Wichita, for appellees/cross-appellants.

Before BRAZIL, P.J., LARSON, J., and JOHN W. WHITE, District Judge, assigned.

BRAZIL, J.: State Farm Mutual Automobile Insurance Company (State Farm) appeals from a jury verdict finding that the State Farm insurance policy issued to Brian Owen provided coverage for Owen's involvement in an automobile accident with Billy Snodgrass on September 29, 1978. Plaintiffs, Snodgrass and his insurance carrier Automobile Insurance Company of Hartford, Connecticut, (Hartford) have cross-appealed.

In July 1978, Owen owned a 1966 Cadillac insured by State Farm. On July 26, 1978, Owen purchased a Camaro from Mark Ball. Ball could not locate the certificate of title, so, approximately one week after receiving Owen's check for the Camaro, Ball issued Owen a bill of sale for the Camaro. Sometime within a week of July 26, Owen took possession of the Camaro and moved it to his home. It was not in running condition.

Owen called his State Farm agent, Bill Ayers, on or around August 26, 1978, and asked Ayers if he could insure the Camaro. Ayers informed Owen that the Camaro could not be insured until Owen obtained the car title. Owen mistakenly thought that the Ball family was continuing to insure the Camaro.

On September 29, 1978, Owen had the Camaro in running condition and was test driving it when the accident occurred. Snodgrass was seriously injured. State Farm denied coverage, and Snodgrass therefore filed suit against Owen, as an uninsured motorist, and Hartford as the insurance carrier for the car Snodgrass was driving. The State Farm uninsured motorist policy limits on the Cadillac were $50,000, whereas the limits of the Hartford policy were $60,000. In addition, Snodgrass had received more than $15,000 in workers compensation benefits. Under Kansas law at the time of the accident, any recovery from Owen's State Farm liability policy would have been subject to the workers compensation carrier's rights of subrogation under K.S.A. 44-504. Conversely, uninsured motorist coverage was not reducible by workers compensation benefits. By proceeding against Hartford's uninsured motorist coverage, Snodgrass received $60,000 from Hartford plus $15,000 or more from workers compensation for a net recovery of more than $75,000; whereas, even if successful

in recovering under the State Farm policy, he would have received $50,000 minus more than $15,000 for a net recovery of less than $35,000.

Neither Owen nor his attorney made any further claims against State Farm after it denied coverage. Snodgrass recovered a judgment against Owen in the amount of $300,000. Hartford paid Snodgrass $60,000 pursuant to the provision in the uninsured motorist insurance policy issued in favor of Snodgrass. State Farm was not involved in the suit.

Owen assigned his right of action against State Farm to Snodgrass and Hartford. Snodgrass and Hartford then brought suit against State Farm, alleging that Owen was insured by State Farm at the time of the accident and that State Farm was obligated under the terms of the policy to defend Owen in the accident suit and to indemnify Owen from judgment in that suit.

State Farm argued that it refused to defend or cover the accident because the Camaro was available to Owen for his frequent or regular use from July 26, 1978, and was therefore not a non-owned automobile as defined by the policy. State Farm also contended that the Camaro was not a newly acquired automobile under the policy because no application for insurance was made within 30 days from the date of the acquisition of the car.

The jury returned a verdict in favor of Snodgrass and Hartford. The jury specifically found that the policy issued by State Farm provided coverage for Owen while driving the Camaro on the date of the accident. The jury found that State Farm failed to defend Owen and deprived him of benefits without just cause or excuse and that State Farm acted with negligence or bad faith in breaching the insurance contract. The plaintiffs were granted judgment in the amount of $300,000 plus $274,762.30 interest accrued from May 14, 1981, until April 15, 1988.

State Farm appealed, and this court dismissed for lack of jurisdiction pursuant to *Miller v. Safeco Ins. Co. of America*, 11 Kan. App. 2d 91, 712 P.2d 1282, *rev. denied* 238 Kan. 878 (1986), in a memorandum opinion filed June 2, 1989. The Supreme Court granted review and, in *Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 246 Kan. 371, 789 P.2d 211 (1990), reversed this court and remanded with directions to reinstate the appeal and cross-appeal.

## 1. Coverage.

State Farm argues that the district court erred in denying State Farm's motion for directed verdict because, as a matter of law, Owen did not qualify for coverage on the Camaro under the "newly acquired automobile" provision or under the "non-owned automobile" provision.

"The standard of appellate review of a motion for directed verdict requires this court to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and when the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury." *Anderson v. National Carriers, Inc.*, 10 Kan. App. 2d 203, 209, 695 P.2d 1293, *rev. denied* 237 Kan. 886 (1985).

In this case, this court should view the evidence in the light most favorable to Snodgrass and Hartford and determine whether reasonable minds could differ as to whether the State Farm policy should cover Owen's car accident.

If reasonable minds could differ, then the trial court was correct in denying the motion and submitting the "matter" to the jury.

However, since the "matter" involved is coverage, and since the determination of coverage requires interpretation of the policy, we must first decide whether the policy is ambiguous. If the policy is ambiguous, we must then determine if the ambiguity in the policy presents a clear question of law or a question of fact. If the ambiguity presents a clear question of law, then the trial court should construe the contract and instruct the jury as to the rights of the parties; whereas, if the ambiguity presents an issue of fact, an instruction similar to PIK Civ. 2d 18.22 should be given to guide the jury in resolving the issue. See PIK Civ. 2d 18.22 Notes on Use.

"The construction of a written instrument is a question of law, and the instrument may be construed and its legal effect determined by an appellate court. [Citation omitted.] Whether an ambiguity exists in a written instrument is a question of law to be decided by the court." *Kennedy & Mitchell, Inc. v. Anadarko Prod. Co.*, 243 Kan. 130, 133, 754 P.2d 803 (1988).

State Farm argues that Owen could not qualify for coverage under the "newly acquired automobile" provision of the Cadillac policy because, pursuant to K.S.A. 1978 Supp. 8-135(c)(7), in effect at the time of this case, title to the Camaro did not pass

to Owen, the result being that Owen did not become the owner of the Camaro. The newly acquired automobile provision provides in relevant part:

"**Newly Acquired Automobile**—means an *automobile*, ownership of which is acquired by the named insured . . . if
. . . .
(2) . . . THE NAMED INSURED WITHIN 30 DAYS FOLLOWING SUCH DELIVERY DATE APPLIES TO THE COMPANY FOR INSURANCE ON SUCH *NEWLY ACQUIRED AUTOMOBILE*."

Under the definitional provisions of the State Farm policy, an "owned motor vehicle" includes a newly acquired automobile.

K.S.A. 1978 Supp. 8-135(c)(7), which is substantially identical to the current version of K.S.A. 1989 Supp. 8-135(c)(7), provided:

"It shall be unlawful for any person to buy or sell in this state any vehicle required to be registered hereunder, unless, at the time of delivery thereof or at a time agreed upon by the parties, not to exceed fifteen (15) days after the time of delivery, there shall pass between the parties such certificate of title with an assignment thereof, as herein provided, and the sale of any vehicle required to be registered under the laws of this state, without the assignment of such certificate of title, shall be fraudulent and void, unless the parties shall agree that the certificate of title with an assignment thereof shall pass between them at a time other than the time of delivery, but within fifteen (15) days thereof."

State Farm alleges that, because Owen did not receive the certificate of title for the Camaro at the time he took delivery of the car or within fifteen days thereafter, the sale of the Camaro was void and Owen did not become an owner of the Camaro and therefore did not qualify for coverage under the owned motor vehicle liability policy. State Farm bases this argument on several cases, including *Perry v. Goff Motors, Inc.*, 12 Kan. App. 2d 139, 736 P.2d 949 (1987). In *Perry* this court said:

"Kansas cases have consistently held that these provisions of the Motor Vehicle Registration Act 'mean exactly what they say; that they are to be literally interpreted and strictly enforced; and that failure to comply therewith renders the sale of a vehicle required to be registered under the Act fraudulent and void.'" 12 Kan. App. 2d at 141.

This court, quoting *In re Littlejohn*, 519 F.2d 356, 358 (10th Cir. 1975), reiterated the policies behind the statute, which are:

"'to provide a ready means for ascertaining the owner of a motor vehicle, compel payment of sales tax by the purchaser of an automobile, prevent

fraud and theft of automobiles, prevent trafficking in stolen automobiles, and to lend stability to the business climate surrounding the sale of automobiles.' " 12 Kan. App. 2d at 141.

Although the Kansas case law seems to uniformly hold that failure to transfer title of a vehicle renders the sale void, this does not mean that an automobile buyer who fails to obtain the car's title does not have an insurable interest.

In *Maryland Cas. Co. v. American Family Insurance Group*, 199 Kan. 373, 429 P.2d 931 (1967), the court dealt with a similar fact situation. In that case, Shaw, owner of a Plymouth, and Willis, owner of a Volkswagen, decided to trade vehicles. They traded cars, but Shaw retained the certificate of title on the Plymouth as security for a promissory note Willis gave Shaw. Shortly after the trade, Willis was involved in an accident in the Plymouth. The other driver who was injured in the accident brought suit against Willis and Shaw. Willis' insurer, Maryland Casualty Company (Maryland), paid a settlement to the driver and brought suit against Shaw's insurer, American Family Insurance Group (American Family), to recover the settlement and costs. The court held that K.S.A. 8-135(c)(6) (Corrick) (substantially identical to K.S.A. 1989 Supp. 8-135[c][7]) made the sale from Shaw to Willis void and Shaw remained the owner of the Plymouth. Consequently, the Plymouth remained an "owned automobile" subject to coverage by Shaw's insurer. 199 Kan. at 380. In reaching this decision, the court noted that the buyer's insurance policy may also cover the loss. 199 Kan. at 379. The court said:

"We believe there are sound reasons for applying the statute to a situation where, as here, it must be determined, despite a purported sale without compliance with the transfer statute, whether or not the seller's insurance policy provides liability coverage while the automobile is being used by the buyer. The statute was enacted not only to protect the public against fraud and prevent traffic in the sale of stolen automobiles but also to lend stability and certainty in the business climate surrounding each transaction. The rights of those persons affected by a particular sale, such as a mortgagee or an innocent purchaser, are safeguarded by strict enforcement of such statute, and public policy would seem to dictate that the statute should be literally enforced for the protection of a third person who suffers injury at the hand of a buyer (driver) who has obtained possession and control of the automobile from the seller but has not received an assigned certificate of title as required by statute. In such case, the injured party should be entitled to the pro-

tection of the seller's insurance if the buyer is operating the automobile as an additional insured under the seller's omnibus clause. *If per chance, as here, the buyer also has coverage under a separate policy issued to him on another automobile as the driver of a non-owned automobile, the injured party is protected under the buyer's policy as well.*" (Emphasis added.) 199 Kan. at 379.

The court refused to reach the issue of whether Willis had a separate insurable interest in the Plymouth, but did say:

"This is not to say that a purported buyer who obtains a new policy is without an insurable interest, although there has not been full compliance with the transfer statute. . . . With respect to automobile liability insurance, there is authority that the general rule requiring an insured to have an insurable interest is satisfied by the *insured's possible exposure to liability for damages incident to the use and operation of the automobile* and does not depend upon his legal or equitable title in the insured vehicle." 199 Kan. at 380-81. (Emphasis added.)

Although in the *Maryland Cas. Co.* case the buyer's insurer was not liable for the loss, the court seems to indicate that, in the appropriate case, the buyer's insurer may be liable.

In its recent supplemental brief, State Farm cites *Maryland Cas. Co.* as supporting its position that the titling statute prevents a finding of ownership for the purpose of liability insurance coverage. While the court used the titling statute to find coverage under the seller's insurance, it did leave the door open to an interpretation that a buyer may have an insurable interest absent compliance with the statute, based on the buyer's possible exposure to liability for damages incident to use and operation of the automobile.

*Maryland Cas. Co.* also indicates that, when both a buyer and seller obtain insurance covering a car, both may be liable for damage suffered by a person involved in an accident with the buyer that occurs while the seller retains the certificate of title. Despite the ramifications of K.S.A. 1989 Supp. 8-135, it is possible for both Ball and Owen to be liable to Snodgrass. Therefore, we must review the newly acquired vehicle provision and the non-owned vehicle provision to determine if reasonable minds could differ as to whether either provision applies in this case.

Under the State Farm policy, an "owned motor vehicle" includes a newly acquired automobile.

Is Owen the owner of the Camaro? Section I of the insurance policy does not define owner. Section II of the policy includes the following definition of owner:

"**Owner**—means a person, other than lienholder, <u>having property in</u> or title to <u>*a motor vehicle*</u>, including a <u>*person*</u> who is entitled to the use and possession of a *motor vehicle* subject to a security interest held by another *person*; but such term does not include a lessee under a lease not intended as security." (Emphasis added.)

The plain language of the insurance policy indicates that obtaining title to a vehicle is not a condition precedent to being the owner of the vehicle. Kansas case law supports this interpretation of the definition of owner. In *Heshion Motors, Inc. v. Trinity Universal Ins. Co.*, 5 Kan. App. 2d 432, 435, 618 P.2d 327 (1980), *aff'd as modified* 229 Kan. 412, 625 P.2d 437 (1981), this court stated:

"It must be recognized, however, that one may actually own an automobile and thus have an insurable interest in it and yet not have legal evidence of title, this on the theory that anyone has an insurable interest in property who derives a benefit from its existence or would suffer loss from its destruction, whether or not he has any title to the property."

State Farm cites several out-of-state cases as precedent for its contention that, as a matter of law, the newly acquired automobile provision is not applicable in this case. Those cases hold that, without title, an acquired vehicle cannot be an "owned" vehicle within the terms of a liability insurance policy.

Although relevant as illustration of other states' interpretation of "owned," the specific policy at issue and the Kansas law, in our opinion, interpret the word "owned" more broadly than do the cited jurisdictions. Kansas law does not mandate that the term "ownership" in an automobile insurance policy be defined strictly in accordance with K.S.A. 1989 Supp. 8-135(c)(7).

In this case, the terms "owned" or "newly acquired" vehicle were susceptible of more than one meaning, which created an ambiguity in the policy that presented a clear question of law. The trial court erred in not finding as a matter of law that the Camaro was a newly acquired vehicle. Whether Owen had taken the necessary action to obtain coverage for a newly acquired vehicle, however, was a question of fact for the jury, and, to that extent, the court correctly denied State Farm's motion for directed verdict. Evidence supporting the denial of directed verdict

is the fact that Owen bought the Camaro on July 26, 1978, took possession (delivery) within a week, and called Ayers at State Farm about insuring the car on or about August 26, 1978. In addition, a claims superintendent at State Farm recommended that State Farm cover Owen's accident.

Could reasonable minds differ on the issue of coverage for the Camaro under the non-owned automobile provision?

A non-owned vehicle is defined as:

"**Non-Owned Automobile**—means an *automobile, trailer* or detachable living quarters unit, other than a *temporary substitute automobile*, not

(1) owned by,
(2) registered in the name of, or
(3) furnished or available for the frequent or regular use of

the named insured, the *spouse* or any *relative*."

State Farm argues that the Camaro was available for Owen's frequent or regular use and therefore could not be a "non-owned automobile" under the insurance policy.

In *Central Security Mut. Ins. Co. v. DePinto*, 235 Kan. 331, Syl. ¶ 5, 681 P.2d 15 (1984), the court defined regular use as "continuous use; uninterrupted normal use for all purposes; without limitation as to use; and customary use as opposed to occasional use or special use." The court said that determining whether the use of a non-owned vehicle is a " 'regular use' " is a question of fact. 235 Kan. 331, Syl. ¶ 4.

In this case, the facts indicate that Owen purchased the Camaro on July 26, 1978. At the time of the purchase, the Camaro was not operable. Owen towed the car to his house approximately one week after the purchase, where it remained unrepaired. Owen obtained exclusive control of keys to the Camaro within several days of the purchase of the car. Owen testified that at the time of the accident the Camaro was his car and he did not need to ask Ball for permission to drive the car. Owen said that on the day of the accident he was test-driving the Camaro after making repairs on the car.

The facts of this case support a finding, as a matter of law, that the Camaro was available for Owen's regular use and could not be covered as a non-owned vehicle. Despite this conclusion, the district court properly denied State Farm's motion for directed verdict because a fact question existed as to whether Owen had

taken the necessary action to obtain coverage for the Camaro as a newly acquired vehicle.

The coverage issue was submitted to the jury on two different theories. Either there was coverage because the Camaro fell under the newly acquired vehicle provision or the Camaro was covered under the non-owned vehicle provision. The verdict form specified only that there was coverage. There were several important fact questions, including: when Owen took possession of the Camaro; when Owen called State Farm to insure the Camaro; and whether the call was made within 30 days. There was sufficient evidence on these questions to support a finding of coverage as a newly acquired vehicle.

On the other hand, a careful review of the record reveals no factual support for a finding that the Camaro was not available for Owen's regular use. Although the plaintiffs went through extensive hypotheticals regarding the extent of coverage on rental cars to attempt to establish the ambiguity of the policy language, the use of the hypotheticals was never linked to the facts of the instant case. Thus, there would not be sufficient competent evidence to support a finding of coverage under the non-owned vehicle provision of the policy.

Given the two theories, one of which is not supported by the evidence, and the jury verdict finding coverage, we conclude that implicit in the jury's verdict is a finding that the phone call by Owen to his State Farm agent was made within 30 days after delivery as required by the policy for coverage as a newly acquired vehicle. There are references in the record that Owen took possession of the car several days after he gave Ball the check on July 26. The phone call was apparently made on August 26, which would be anywhere from 24 to 31 days after possession, depending on when possession was taken. Thus, there is evidence to support the finding that the phone call was made within 30 days.

There was substantial competent evidence to support a finding that the Camaro was a newly. acquired automobile covered by the State Farm policy, and it was harmless error to submit the questions of law relating to "owned" and "non-owned" vehicle to the jury.

## 2. Excess judgment.

State Farm argues that the trial court erred in entering judgment against it in excess of the policy limits. State Farm's argues that the judgment in excess of the policy limits is not traceable to State Farm's refusal to defend and that, therefore, it should not be liable for the excess judgment.

In the suit brought by Snodgrass against Owen, State Farm refused to defend Owen. Owen was represented by independent counsel. In the present case brought by Hartford and Snodgrass against State Farm five years after their judgment against Owen, Hartford offered to settle with State Farm for State Farm's policy limits during the trial. The settlement offer was made in front of the jury almost seven years after the judgment against Owen. State Farm rejected the settlement offer and the case went to the jury. The jury returned a verdict in favor of Hartford, finding that the State Farm policy provided coverage for Owen while driving the Camaro, that State Farm refused to defend Owen without just cause or excuse, and that State Farm's breach of the insurance contract was negligent or in bad faith. The district court entered judgment in favor of Hartford for $300,000 plus interest for a total judgment of $574,762.30.

The jury's finding of negligence or bad faith is not supported by substantial competent evidence. Examining State Farm's conduct prior to judgment, as a matter of law, State Farm's refusal to defend Owen was not a factor in the subsequent $300,000 judgment.

This court, in *George R. Winchell, Inc. v. Norris*, 6 Kan. App. 2d 725, 633 P.2d 1174, *rev. denied* 230 Kan. 817 (1981), discussed the law regarding an insurance company's liability for a judgment in excess of policy limits for wrongful refusal to defend. This court stated:

"An automobile liability insurer who wrongfully refuses to defend an action against its insured is not liable for the amount of the judgment entered against the insured which is in excess of the insurance policy limits, absent a showing by its insured that the excess judgment is traceable to the insurer's refusal to defend." 6 Kan. App. 2d 725, Syl. ¶ 2.

In *Winchell*, James Norris caused an accident which injured the driver of a tractor-trailer. The driver brought suit against Norris. Norris' insurer refused to defend Norris. Default judgment was entered against Norris. Subsequently, an order of garnish-

ment was entered against Norris' insurer. The district court found that coverage existed under Norris' insurance policy and entered judgment against the insurer for the policy limits. On appeal, the plaintiff argued that because the insurer wrongfully refused to defend Norris, the insurer should be liable for the judgment rendered against the insured in excess of the policy limits.

This court found that the insurer should not be liable for the judgment in excess of the policy limits. However, this court did indicate that in certain circumstances, an insurer may be liable for a judgment in excess of the policy limits. One such circumstance is when an offer of settlement within the policy limits is rejected, combined with a refusal by the insurer to defend. In reviewing this situation, this court stated:

"The leading case dealing with this point is *Comunale v. Traders & General Ins. Co.*, 50 Cal. 2d 654, 328 P.2d 198 (1958). In *Comunale*, the insurer wrongfully refused to defend and a settlement offer was made to the insured that was within the policy limits. The offer was refused by the insurer. The California Supreme Court held:

'[A]n insurer, who wrongfully declines to defend and who refuses to accept a reasonable settlement within the policy limits in violation of its duty to consider in good faith the interest of the insured in the settlement, is liable for the entire judgment against the insured even if it exceeds the policy limits.' 50 Cal. 2d at 661.

The theory behind this position is that by refusing a settlement offer, the insurer is causing a discernible injury to the insured. A refusal to defend, in itself, can be compensated for by paying the costs incurred in the insured's defense. But when a settlement offer is also rejected, the injury to the insured is traceable to the insurer's breach. . . .

"Absent a settlement offer, the plain refusal to defend has no causal connection with the amount of the judgment in excess of the policy limits. If the insured has employed competent counsel to represent him, there is no basis for concluding that the judgment would have been for a lesser sum had the defense been conducted by insurer's counsel. If there was a settlement offer within the policy limits, however, then a causal connection would exist." 6 Kan. App. 2d at 728-29.

Although State Farm refused to represent Owen, he was represented by competent counsel in a case in which Owen's liability was clear and Snodgrass' injuries were extensive, and there was no offer to settle within State Farm's policy limits. Applying the *Comunale* criteria, there is no basis to conclude that judgment would have been for a lesser sum if State Farm had defended Owen.

In *Winchell,* this court also discussed the requirement of bad faith in rejecting a settlement offer. This court said:

"As a general rule, a finding of bad faith is required for a finding of liability of amounts in excess of the policy limits. *Seward v. State Farm Mutual Automobile Insurance Co.,* 392 F.2d 723, 726 (5th Cir. 1968). The most compelling question concerning the bad faith requirement is at what stage a finding of bad faith is required in order for it to have an effect on the insurer's liability. A review of the cases suggests that an exercise of bad faith by the insurer in the refusal of an offered settlement is required, which makes it comparable to the situation which exists absent a refusal of a defense. A showing that bad faith was exercised when the insurer made the initial decision of whether to defend or not is not required. [Citations omitted.] In the latter situation, a wrongful refusal is enough to constitute breach. If no settlement offer is made, the existence of good or bad faith is irrelevant." 6 Kan. App. 2d at 730.

In the instant case, there was no settlement offer prior to the judgment. Thus, there can be no finding of bad faith on the part of State Farm at that point in time. Neither was State Farm obligated to initiate settlement negotiations prior to judgment. In *Smith v. Blackwell,* 14 Kan. App. 2d 158, 163, 791 P.2d 1343 (1989), this court indicated that the fiduciary relationship between insured and insurer obligated the insurer to initiate settlement negotiations and attempt to arrive at a reasonable settlement. In *Smith,* however, the insurance company clearly had coverage, and there was no question regarding the liability of the insured. In the present case, State Farm had legitimate grounds to believe it was justified in denying coverage. An insurance company should not be required to settle a claim when there is a good faith question as to whether there is coverage under its insurance policy. If there is no coverage, there is no fiduciary relationship between the tortfeasor and the insurance company. Given State Farm's good faith claim that its insurance policy did not cover the Camaro, it did not have to attempt to settle the claim, and there was no bad faith prior to judgment.

This does not, however, dispose of the plaintiffs' claim against State Farm. There was an offer to settle for policy limits during the trial of this case almost seven years after judgment against Owen. The offer was disclosed to the jury and offered into evidence. State Farm rejected the offer. In a conference at the

bench, the following remarks were made by plaintiffs' counsel regarding the reason for the offer:

"The problem with this case is that Mr. Kerwick has raised the issue that if you don't have any evidence that you made an offer to settle within the policy limits, you don't have any right to proceed for excess. So, as part of our case in chief the claims superintendent has said that he wrote a disclaimer letter. And I take it to mean we have a right to do this at any time, it's our position. We are now offering this as evidence to the jury that we did offer to settle within the policy limits if we can't get it settled."

This offer must be evaluated in light of the recent Kansas Supreme Court pronouncements of the law in *Glenn v. Fleming*, 247 Kan. 296, 799 P.2d 79 (1990). *Glenn* involved a claim against an insurer for bad faith refusal to settle a personal injury lawsuit. The plaintiff was attempting to recover the judgment in excess of Aetna's policy limits and based his claim on Aetna's failure to settle for its policy limits prior to judgment.

In evaluating the offer to settle, the court stated the following rules:

"The question of an insurer's liability for an excess judgment depends upon the circumstances of the particular case and must be determined by taking into account the various factors present rather than on the basis of any general statement or definition.

"The conduct of the insurer must not be viewed through hindsight. Instead, the offer and the strength of the plaintiff's case must be viewed as they fairly appeared to the insurer and its agents and attorneys at the time the offer was refused. [Citations omitted.]

"An insurance company acting honestly and in good faith upon adequate information should not be held liable because it failed to prophesy the result. Something more than mere error of judgment is necessary to constitute bad faith." 247 Kan. at 305-06.

The trial court in *Glenn* evaluated the offer to settle and determined that no bad faith liability could arise from an insurer's failure to accept an unreasonable offer. The court then found the offer to be unreasonable because it was conditional, premature, and only open for two weeks. The Kansas Supreme Court agreed.

In the instant case, State Farm argues that under *George R. Winchell, Inc. v. Norris*, 6 Kan. App. 2d 725, there can be no causal link between the failure to settle during the subsequent trial in this case and the earlier entry of the judgment in the case against Owen. Therefore, State Farm cannot be liable for

the excess. The factual situation, however, was different in *Winchell*, and such a mechanical application of the holding would not be appropriate. *Winchell* examined the liability of an insurer for a wrongful failure to defend its insured and determined there was no liability absent a showing of damages traceable to the breach. 6 Kan. App. 2d 725, Syl. ¶ 2. In *Winchell*, there was no settlement offer, and it was determined the judgment was not traceable to the wrongful refusal to defend. 6 Kan. App. 2d 725, Syl. ¶ 3. This rule was established in a case assessing the bad faith of an insurer *prior* to judgment. As the analysis above indicates, *Winchell* continues to be a valid case for its stated proposition of addressing the insurer's actions prior to entry of judgment but should not be extended to cut off inquiry into the insurer's post-judgment conduct.

In addition, the public policy of requiring insurers to give " '[f]air and equal consideration [to] the insured's vulnerable position' " would not be furthered by adopting State Farm's position. *Smith v. Blackwell*, 14 Kan. App. 2d at 163. In the instant case, there was no covenant not to execute, so theoretically Owen could be subjected to the excess liability by State Farm's failure to accept a settlement offer even after judgment. Thus, State Farm's refusal to settle at trial should be analyzed in light of the law set forth in *Glenn v. Fleming*, 247 Kan. 296.

It is clear on the facts of this case that there was no negligence or bad faith on the part of State Farm. By finding coverage for Owen, this court recognizes it goes beyond any current Kansas case law in holding that, absent specific reference in a motor vehicle insurance policy, K.S.A. 1989 Supp. 8-135 (c)(7) is not applicable when determining liability coverage based on "ownership" of or "insurable interest" in a motor vehicle. State Farm had a good faith argument that its policy did not provide coverage for the Camaro, and, as the court in *Glenn* stated, State Farm should not be held liable for failing to "prophesy the result." 247 Kan. at 305. Further, there is the issue of Owen's bankruptcy. Because of a motion in limine, no evidence of the bankruptcy was admitted at trial. State Farm, however, had that information, and consideration of the bankruptcy must have entered into State Farm's decision in rejecting the settlement offer.

In short, viewing the offer and the circumstances and reason it was made and assessing the strength or weakness of the plaintiff's case on the question of coverage, it was not unreasonable for State Farm to believe that, under Kansas statutory and case law, it did not have coverage. Likewise, because of Owen's bankruptcy, State Farm could reasonably conclude that its refusal of the offer would not impact on Owen's liability.

Even beyond State Farm's good faith belief it did not have coverage on the Camaro, the offer itself was unreasonable, and rejection of an unreasonable offer cannot give rise to bad faith liability. See *Glenn v. Fleming,* 247 Kan. at 307. The offer was staged because State Farm was predicating no liability on the basis that no settlement offer had ever been made. A settlement offer was presented during trial and, subsequently, presented to the jury. There was limited time to consider the offer, and it was only offered as evidence to show the jury that State Farm rejected an offer. On either basis, State Farm was acting in good faith and upon adequate information in rejecting the offer. Thus, State Farm is not liable for that portion of the judgment that exceeds its policy limits.

State Farm, in its most recent brief, concedes that, if coverage is found, it owes interest on the whole judgment pursuant to the terms of its policy and the rule stated in *Glenn v. Fleming,* 247 Kan. at 319.

### 3. Jury Instructions.

State Farm argues that the district court erred in giving the following instruction (No. 15) to the jury: "This case involves the interpretation of a policy of insurance. Where the terms of a policy of insurance are susceptible of more than one construction, the construction most favorable to the insured must prevail." State Farm first argues that while the instruction may be a correct statement of the law, the principles stated do not apply when the policy is unambiguous. State Farm contends that only the trial judge, not the jury, can determine whether a policy is ambiguous and that the trial judge here abdicated his judicial authority by letting the jury decide the issue of ambiguity.

State Farm then argues that the meaning of "regular and frequent use" has been held to be unambiguous, citing *Central*

*Security Mut. Ins. Co. v. DePinto*, 235 Kan. 331, 681 P.2d 15 (1984).

However, Instruction No. 15 was given without reference to any particular language in the policy. The instruction could be used by the jury to interpret any term in the policy.

If any term in the insurance policy could be viewed as ambiguous by the jury, the instruction was proper. In this case, the parties were in dispute as to whether Owen was an "owner" of the Camaro. The State Farm policy defined "owner," but at trial, State Farm argued that Owen was required to obtain the Camaro's certificate of title to qualify as an "owner" under the policy. The jury could reasonably find that the term "owner" was susceptible to more than one meaning. Although the trial judge should have first made a finding that the policy was ambiguous before submitting the instruction, the issue regarding "owner" supports our conclusion that the judge implicitly found the policy to be ambiguous when he submitted the instruction.

State Farm argues that the district court erred in giving the following instruction (No. 16): "The term regular use, as it is used in the definition of 'Non-Owned Automobile' means continuous use; uninterrupted normal use for all purposes; without limitation as to use; and customary use as opposed to occasional use or special use." State Farm suggests that the instruction is incomplete and should include a definition of *"furnished for* regular use."

The instruction given by the trial court was taken from *Central Security Mut. Ins. Co. v. DePinto*, 235 Kan. 331, Syl. ¶ 5, which defined regular use as "continuous use; uninterrupted normal use for all purposes; without limitation as to use; and customary use as opposed to occasional use or special use."

State Farm fails to show how the trial court erred in giving Instruction No. 16 or how the instruction prejudiced State Farm. The jury instruction is a fair interpretation of the law. The district court did not err in giving the instruction.

State Farm argues that the trial court erred in giving Instruction No. 12. When the district court proposed Instruction No. 12, counsel for State Farm said, "We [object], Your Honor—I withdraw my objection. 12 is acceptable, Your Honor."

"The rule is well established in this state that a party may not assign as error the giving or failure to give an instruction unless he objects to the instruction stating the specific grounds for the objection. Absent such objection, an appellate court may reverse only if the trial court's failure to give the instruction was clearly erroneous." *State v. Holley*, 238 Kan. 501, 506, 712 P.2d 1214 (1986).

" 'An instruction is clearly erroneous when a reviewing court reaches a firm conviction that if the trial error had not occurred, there was a real possibility that the jury would have returned a different verdict.' " *State v. Patterson*, 243 Kan. 262, 268, 755 P.2d 551 (1988).

In this case, State Farm did not properly object to Instruction No. 12 or give specific grounds for the objection. The record does not indicate that, absent the giving of Instruction No. 12, the jury would have returned a different verdict. The district court did not err in giving Instruction No. 12.

**4. Expert witness.**

The plaintiffs called Bill Hensley, Snodgrass' attorney in the action against Owen and Hartford, to testify as an expert. State Farm now argues that it was error to allow his testimony. State Farm does not specifically indicate what was improper about the testimony. During Hensley's testimony, State Farm objected twice. The first question objected to was not answered. The only other objection State Farm lodged during Hensley's testimony was made when Hensley was asked to explain why, as Snodgrass' attorney, he had alleged in an amended petition that Owen was uninsured. The following exchange occurred:

"Q. [Snodgrass' and Hartford's counsel] How does Number 4 relate to the facts of this case?

"[State Farm's counsel] I object, Your Honor. It is improper opinion and, again, the petition speaks for itself.

"THE COURT: He is an expert. I'll let him answer.

"A. Simply stated, you really don't have to be an expert, but this is — this means that to make the allegations that we made in the First Amended Petition, we didn't have to make the ultimate decision that you Ladies and Gentlemen of the Jury and Judge Kimmel are going to make in this case.

"Number one, the fact that State Farm had denied coverage under Paragraph 4 of the uninsured motor vehicle definition all by itself justified and authorized joining whatever the name of that company is, State Automobile Insurance Company of Hartford, or whatever Aetna's sub was, as a defendant in Billy's case."

"The trial court has wide discretion in allowing the testimony of expert witnesses and the use of such testimony ordinarily goes to the weight of the evidence and not its admissibility." *Kearney v. Kansas Public Service Co.*, 233 Kan. 492, Syl. ¶ 6, 665 P.2d 757 (1983). The opinion of an expert should be considered by the jury, and given the weight which the jury deems proper. An expert opinion may be disregarded. *In re Adoption of Irons*, 235 Kan. 540, Syl. ¶ 2, 684 P.2d 332 (1984). In this case, the trial court did not abuse its discretion by allowing Hensley's testimony with regard to the reason for amending the petition.

**5. Rental car evidence.**

State Farm objects to the relevancy of hypothetical questions relating to policy coverage when driving rental cars and letters concerning the same subject from a State Farm representative. Relevancy of testimony and other evidence rests within the trial court's discretion; in these instances, the trial court did not abuse its discretion.

**6. Attorney fees.**

State Farm argues that the trial court erred in awarding attorney fees on a "50-50" contingency basis.

No appeal or cross-appeal was taken from the May 2, 1988, order awarding attorney fees. Following the Supreme Court decision in this case, attorney fees at the district court level are no longer an issue on appeal.

**1. Cross-appeal: jury instructions.**

In its cross-appeal, Hartford alleges that, in the event this court sets aside the jury's verdict and remands the case for a new trial, this court should consider whether the district court erred in refusing to give Hartford's requested jury instructions relating to whether the limiting phrase "furnished or available for the frequent or regular use of" is an "appropriate reference" as the term "appropriate reference" is used in K.S.A. 40-3107(a).

This court will not find error with jury instructions unless the instructions resulted in prejudice to the appealing party. *Trout v. Koss Constr. Co.*, 240 Kan. 86, 88-89, 727 P.2d 450 (1986). Since we are affirming the jury verdict against State Farm on the issue of coverage, Hartford, as the prevailing party, cannot show prejudice resulting from the district court's refusal to give

its requested instructions. The district court did not err in refusing to give Hartford's instructions.

## 2. Cross-appeal: additional attorney fees on appeal.

The second issue raised by Snodgrass and Hartford concerned the amount of attorney fees awarded. The notice of cross-appeal did not specify the fee amount as an issue. This court initially concluded, and the Supreme Court agreed, that the issue was not preserved for appeal and would not be considered.

Hartford and Snodgrass filed a motion for attorney fees on appeal pursuant to Supreme Court Rule 7.07(b) (1990 Kan. Ct. R. Annot. 37), which provides: "Appellate courts may award attorney fees for services on appeal in any case in which the trial court had authority to award attorney fees." Hartford and Snodgrass argue that the district court had authority to award fees pursuant to K.S.A. 40-256 and request this court to do the same.

The district court awarded Hartford attorney fees pursuant to K.S.A. 40-256 in the amount of $144,000. The trial court included attorney fees for services to be rendered in pursuing an appeal. This court decided that, as no appeal was taken from the May 2, 1988, order awarding attorney fees, attorney fees were no longer an issue on appeal. The Supreme Court affirmed this holding. The motion for additional attorney fees on appeal is denied.

We affirm the finding of coverage, reverse the judgment in excess of policy limits, dismiss the issue of attorney fees awarded by the trial court, deny the motion for additional attorney fees on appeal, and affirm all remaining issues.