FILED
United States Court of Appeals
Tenth Circuit

February 17, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

BRENDA C. ROBERTS,

Plaintiff-Judgment Creditor-Appellant,

v.

PATRICK PRINTUP, JR.,

Defendant-Judgment Debtor,

SHELTER MUTUAL INSURANCE
COMPANY,

Garnishee-Appellee.

No. 08-3189

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:02-CV-02333-CM)**

David A. Hoffman (Donald W. Vasos with him on the briefs) of Vasos Law
Offices, Shawnee Mission, Kansas, for Plaintiff-Judgment Creditor-Appellant.

Craig C. Blumreich (Joel W. Riggs with him on the brief) of Larson & Blumreich,
Chartered, Topeka, Kansas, for Garnishee-Appellee.

Before **MURPHY**, **SEYMOUR** and **TYMKOVICH**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Brenda C. Roberts appeals the district court's decision that barred her garnishment action against Shelter Mutual Insurance Company ("Shelter"), which sought collection of a judgment in excess of policy limits. We reverse.

**I**

On April 21, 2000, Patrick Printup, Jr., Ms. Robert's sixteen-year old son, was driving their car when the car's brakes failed.[1] The car struck a utility pole, chain link fence, and park bench. As a result, Ms. Roberts, a passenger at the time of the accident, was badly injured.

The car was titled and registered to both Ms. Roberts and Mr. Printup and was insured by Shelter. The insurance policy provided up to $25,000 in liability coverage per person for both property damage and bodily injury, and $4,500 in Personal Injury Protection (PIP). Shelter received notice of the accident on April 25, 2000. "Shelter logged the incident as a Code 39, which means, 'one-car accident, insured at fault.'" District Court Order at 3 ¶ 10 (July 10, 2008) ("Order"). Shelter's note on the accident file stated: "'may have BI' (bodily injury) and that PIP would apply and that medical information should be collected." *Id*. ¶ 13. After Ms. Roberts told one of Shelter's employees that she

---

[1] The facts are taken from our previous decision in this case, *Roberts v. Printup*, 422 F.3d 1211, 1212 (10th Cir. 2005), and the district court's July 10, 2008 Memorandum and Order ("Order").

did not believe her son was at fault, however, Shelter did not further investigate the circumstances of the accident. In June 2000, Ms. Roberts submitted an application to Shelter for PIP benefits. Shelter thereafter paid $4,500 towards Ms. Roberts's medical bills, exhausting the policy's PIP benefits.

Ms. Roberts was still being treated for her injuries in February 2002,[2] having had four surgeries and a skin graft. Aple. App. at 23. On April 11, 2002, Ms. Roberts consulted counsel regarding the quality of her medical care. On her counsel's advice, Ms. Roberts hand wrote a letter to Shelter offering to settle for policy limits to satisfy all her claims against Printup, Shelter's insured, arising from the accident.[3] The letter explained the nature of her injury, her ongoing treatment, and estimated medical expenses in excess of $150,000. Aplt. App. at 37. She sent the letter to protect her claim against the two-year statute of limitations for filing claims against Printup, which was expiring on April 22,

---

[2] The district court found that:
> As a result of the accident, plaintiff sustained open compound fractures of her right tibia and fibula. The fractures failed to knit, and she eventually had her right ankle joint fused. Plaintiff required home health care for approximately one year after returning home from the hospital, and her medical bills totaled over $125,000.

Order at 3 ¶ 8.

[3] Ms. Roberts claimed that she contacted Shelter in late 2000 or early 2001 to inquire about making a liability claim but was told that she was not entitled to compensation under Printup's liability policy. Shelter disputed this claim. The district court ruled for Shelter, finding that the trial testimony of Ms. Roberts and another witness, a friend who was with Ms. Roberts at the time she made the call, was not credible.

2002. As the district court noted, the letter stated: "I am running out of time and need your answer within ten days." *Id*. at 7 ¶ 27. The district court found that Ms. Roberts and her attorney "had an agreement that if Shelter paid its policy limits of $25,000 before the statute of limitations expired, [she] would not owe attorney fees on her recovery." *Id*. ¶ 29. She "instructed her attorney to dismiss the lawsuit if Shelter accepted her offer before the statute of limitations expired, but to serve defendant if Shelter did not accept her offer." *Id*. ¶ 31. The lawsuit was filed "on April 16, 2002, [requesting] issuance of summons on April 24." *Id*. Ms. Roberts notified her attorney when she had not received a response from Shelter at the end of ten days, aplt. app. at 72, and he permitted the lawsuit to go forward.

In the meantime, Ms. Roberts' settlement offer to Shelter was marked "received" on April 15 at Shelter's Topeka claims office, where Ms. Roberts had been informed to send it when she called Shelter to obtain an address the day she mailed it. Notwithstanding the need for immediate action expressed in the letter, six days later, on April 21, 2002, Shelter's claims office mistakenly mailed the letter to the PIP department in Columbia, Missouri. The PIP department then mailed Ms. Roberts' letter to the Kansas City claims department, where it was received on May 6, 2002, three weeks after its initial delivery to Shelter.

On May 7, 2002, Shelter advised Ms. Roberts that, upon confirmation of the medical bills, it would pay the limits of its liability coverage. Shelter then

offered to pay the $25,000 liability policy limit. As the district court found, "when [Shelter] failed to respond to plaintiff's April 11, 2002 letter within ten days . . . , plaintiff became obligated to pay her attorney a portion of her recovery." *Id.* ¶ 13. Accordingly, Ms. Roberts declined the offer. Shelter hired a lawyer to defend Printup in the lawsuit. Subsequently, Shelter, Ms. Roberts and Printup signed a Settlement Agreement. The agreement stated that "[w]ith the consent of Shelter, Printup offers to confess judgment in favor of Roberts on the issue of fault and causation and submit the issue of damages to the Court for decision." Aplt. App. at 40. The parties agreed that Ms. Roberts would submit evidence to the district court to support her damages, and that they would abide by the court's determination. They also agreed that the "settlement provided herein is fair and reasonable, is not collusive, and is entered into in good faith and as a means of amicably resolving their dispute." *Id.* at 42.

Thereafter, the district court found that Ms. Roberts had sustained past and future damages in the amount of $732,200 for economic loss, $250,000 for non-economic loss, and $51,691.60 in medical expenses, for a total of $1,033,891.60. Aplt. App. at 47. The court approved the settlement and entered judgment in favor of Ms. Roberts. *See Roberts*, 422 F.3d at 1214. Shelter then paid the $25,000 policy limit.

In exchange for Printup's assignment of his claim against Shelter for bad faith or negligent failure to settle Ms. Robert's claim against him, Ms. Roberts

-5-

agreed not to execute her judgment against Printup.  Aplt. App. at 39-42; *see*

*Glenn v. Flemming*, 799 P.2d 79, 84 (Kan. 1990).  As contemplated by the

Settlement Agreement, Ms. Roberts then filed a garnishment action against

Shelter seeking to collect the judgment in excess of the policy limits, arguing that

Shelter acted negligently or in bad faith in handling the claim against its insured.

After discovery, the district court granted Shelter's motion for summary

judgment.  Ms. Roberts appealed, and we affirmed as to Ms. Roberts' claim of

bad faith but reversed and remanded as to the negligence claim.  *See Roberts*, 422

F.3d at 1220.

As relevant here, we disagreed with the district court's conclusion that

Shelter's errors in handling Ms. Roberts' time-sensitive offer of settlement could

not constitute negligence, "particularly in light of the UNFAIR CLAIMS

SETTLEMENT PRACTICES MODEL REGULATION § 6(a)." *Id.* at 1219.[4]  We advised

the district court that it should consider the factors set out by the Kansas Supreme

---

[4] We explained:
Kansas Administrative Regulation 40-1-34, with some exceptions not
relevant here, adopts by reference the Unfair Claims Settlement
Practices Model Regulation.  No exceptions are set forth as to § 6(a),
which provides that '[e]very insurer, upon receiving notification of a
claim shall, within ten working days, acknowledge the receipt of
such notice unless payment is made within such period of time.'
UNFAIR CLAIMS SETTLEMENT PRACTICES MODEL
REGULATION § 6(a), *available* at
http://www.ksinsurance.org/company/Model_Laws/Ref_40-1-34.htm.
*Roberts*, 422 F.3d at 1218-1219.

Court in *Bollinger v. Ness*, 449 P.2d 502, 511 (1969), in deciding "[a] challenge to an insurer's handling of a claim[, which] requires an individualized approach." *Roberts*, 422 F.3d at 1219.

After a bench trial on remand, the district court found that (1) "[i]n April 2002, Shelter did not have a written policy, procedure, or mechanism in place to ensure that a claim would be acknowledged within ten working days," Order at 8 ¶ 37; (2) Ms. Robert's "conduct was not arbitrary," *id.* at 14 ¶ 17; (3) she "did not intentionally send her claim to the wrong office or artificially and unnecessarily shorten Shelter's available response time in order to set up or manufacture a bad faith claim," *id.* at 7 ¶ 26; and (4) "[i]n light of the statute of limitations on her claim, plaintiff reasonably set a ten-day deadline," *id.* at 14 ¶ 17. The district court concluded that "[t]he April 11, 2002 letter . . . was a time-sensitive demand letter that created a duty for Shelter to act without negligence in handling the offer," *id.* at 9 ¶ 2, and that "Shelter breached a duty when it failed to respond to plaintiff's April 11, 2002 letter within ten days. As a result, plaintiff became obligated to pay her attorney a portion of her recovery." *Id.* at 13 ¶ 13.

Notwithstanding these findings, the district court held that Shelter's negligence in handling Ms. Roberts' claim did not "cause" the excess judgment against Printup, relying on our decision in *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 674 (10th Cir. 2007). *Id.* at 14, ¶ 16. The court was "unconvinced that the circumstances changed enough during the three weeks between plaintiff's

deadline and Shelter's attempted settlement to justify plaintiff's refusal to settle."
*Id.* at 14, ¶ 17. The court therefore concluded that Shelter was not liable for the
excess judgment. *Id.* Ms. Roberts appeals.

## II

"In an appeal from a bench trial, we review the district court's factual
findings for clear error and its legal conclusions de novo." *Lippoldt v. Cole*, 468
F.3d 1204, 1211 (10th Cir. 2006) (citations omitted). Our review of mixed
questions of law and fact will be "under the clearly erroneous or de novo
standard, depending on whether the mixed question involves primarily a factual
inquiry or the consideration of legal principles." *Estate of Holl v. Comm'r*, 54
F.3d 648, 650 (10th Cir. 1995). Ms. Roberts does not challenge the district
court's findings of fact and Shelter has not cross-appealed.

"In cases arising under diversity jurisdiction, the federal court's task is not
to reach its own judgment regarding the substance of the common law, but simply
to ascertain and apply the state law." *Wade*, 483 F.3d at 665 (citation and
quotation marks omitted). Accordingly, our analysis starts with summarizing
Kansas' somewhat unique applicable law.

Under Kansas law, even though an insurer's duties to its insured are
contractually based, breach of such duties is determined by a tort standard of care.
*See Moses v. Halstead*, Nos. 581F.3d 1248, 1251 (10th Cir. Sept. 8, 2009) (citing

*Glenn v. Fleming*, 799 P.2d 79, 90 (Kan. 1990)).  As a result, Kansas courts use negligence, due care, and other tort concepts to describe the substance of this contract duty.  *See id.*

Moreover, under established Kansas law an insurance company's negligent or bad faith rejection of an injured party's offer to settle within the policy's limits constitutes a breach of its contract with the insured and gives rise to liability for any judgment in excess of the policy limits.  *See Wade*, 483 F.3d at 660 (citing *Bollinger v. Nuss*, 449 P.2d 502, 508 (Kan. 1969)).  The same rule applies to instances in which the insurance company negligently or in bad faith delays in accepting an offer to settle within the policy's limits.  *See id*. at 667 (citing *Glenn,* 799 P.2d at 82).

To determine whether an insurance company is negligent in such cases, the Kansas Supreme Court considers the various factors present in each case.  *See Bollinger,* 449 P.2d at 512.  These factors include:

> (1) the strength of the injured claimant's case on the issues of liability and damages; (2) attempts by the insurer to induce the insured to contribute to a settlement; (3) failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; (4) the insurer's rejection of advice of its own attorney or agent; (5) failure of the insurer to inform the insured of a compromise offer; (6) the amount of financial risk to which each party is exposed in the event of a refusal to settle; (7) the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and (8) any other factors tending to establish or negate bad faith on the part of the insurer.

*Wade*, 483 F.3d at 667 (quoting *Bollinger*, 449 P.2d at 512).  Applying Kansas

-9-

law and considering the factors present in *Wade*, we held there that it was

> necessary to take into consideration, in addition to the other pertinent *Bollinger* factors, relevant aspects of the third-party plaintiff's conduct, *including any responsibility the plaintiff might have for the insurer's lack of adequate information upon which to judge a proposed settlement offer and the reasons the plaintiff had for declining to entertain an offer after expiration of a deadline.*

483 F.3d at 670 (emphasis added).

Our reasoning in *Wade* is consistent with the Kansas Supreme Court's holding that "there must be a causal link between the insurer's conduct and the excess judgment against the insured . . . ." *Hawkins v. Dennis*, 905 P.2d 678, 690 (Kan. 1995) (citing *Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 804 P.2d 1012, 1021 (Kan. Ct. App. 1991)). *Snodgrass* recognized that,

> *an insurer*, who wrongfully declines to defend and *who refuses to accept a reasonable settlement within the policy limits in violation of its duty to consider in good faith the interest of the insured in the settlement, is liable for the entire judgment against the insured even if it exceeds the policy limits.*
>
> *The theory behind this position is that by refusing a settlement offer, the insurer is causing a discernible injury to the insured.* A refusal to defend, in itself, can be compensated for by paying the costs incurred in the insured's defense. But when a settlement offer is also rejected, *the injury to the insured is traceable to the insurer's breach. . . .*

804 P.2d at 1021 (emphasis added) (citations and quotation marks omitted). As we held in *Wade*, however, the causal link is broken when an injured party manufactures a lawsuit in an effort to recover a larger award and thereby causes the insurance company's delay in accepting the settlement offer. *See Wade*, 483

-10-

F.3d at 674.

It is also relevant that in general under Kansas law "all the good faith and settlement offers in the world *after* suit is filed will not immunize a company from the consequences of *an unjustified refusal to pay* which made the suit necessary." *Sloan v. Employers Cas. Ins. Co.*, 521 P.2d 249, 251 (Kan. 1974) (emphasis added). "If an insurer were permitted to 'cure' an earlier breach of a fiduciary duty, the policy of encouraging an insurer to exercise due care and attempt to settle claims in a fair and expeditious manner would be undermined." *Smith v. Blackwell*, 791 P.2d 1343, 1347 (Kan. Ct. App. 1989). We recognized this concept in *Wade*, 483 F.3d at 670 n.3, where we said:

> [W]e do not hold that an insurer's attempt to accept an expired offer serves to absolve the insurer of any liability for damages to the insured caused by the insurer's earlier bad faith failure to settle. *S. Gen. Ins. Co. v. Holt*, 200 Ga.App. 759, 409 S.E.2d 852, 858 (1991) [*General Southern*], *vacated on other grounds* by *S. Gen. Ins. Co. v. Holt*, 262 Ga. 267, 416 S.E.2d 274 (1992). Under the Kansas Supreme Court's multi-factor approach in *Bollinger*, the jury should consider all relevant factors bearing on the good faith of the insurer, and only when no reasonable jury could conclude that the insurance company acted negligently or in bad faith is the company entitled to summary judgment.

The case relied on by *Wade* for this proposition is instructive. In *General Southern*, the insurer claimed that its acceptance of the expired offer to settle within the policy limits constituted a defense to liability. *See General Southern*, 409 S.E.2d at 858. The insurer contended there was no reason why the settlement offer, which was good on a particular date, was unavailable two days later. *See*

-11-

*id.* The court rejected the insurer's argument, stating that "the causal connection between an original act of negligence and injury to another is not broken by the intervening act of a third person, if the nature of such intervening act was such that it could reasonably have been anticipated or foreseen by the original wrong-doer." *Id.* (citation and internal quotation marks omitted). Kansas follows this principle. *See, e.g., Miller v. Zep Mfg. Co.*, 815 P.2d 506, 518 (Kan. 1991) (the rule that the causal connection between an actor's wrongful act and an injury is broken by an independent intervening cause does not apply when the intervening cause might reasonably have been foreseen by the actor.)

It is readily apparent that it was foreseeable to Shelter that its negligence in failing to implement a system to handle reasonable time-sensitive settlement offers from an injured party could result in a lawsuit being filed against its insured. Accordingly, its attempt to accept the expired offer in this case did not absolve it of liability for damages to its insured caused by its earlier negligent failure to settle. *See id.* at 518; *Wade*, 483 F.3d at 670 n.3 (citing *Holt*, 409 S.E.2d at 858); *see also Snodgrass*, 804 P.2d at 1021 ("[W]hen a settlement offer is . . . rejected, the injury to the insured is traceable to the insurer's breach." (citing *George R. Winchell, Inc. v. Norris*, 633 P.2d 1174, 1177 (Kan. Ct. App. 1981))). As the court said in *General Southern*, 409 S.E.2d at 764:

> We reject [General Southern's] argument that an insurer's conduct must be viewed exclusively within the context of the scale of its operations and the internal procedures it has promulgated in order to

conduct its business in the fashion it prefers, regardless of the impact those claims procedures may have upon its insureds' interests. The law imposes upon the insurer the duty to exercise diligence, intelligence, good faith, and honest and conscientious fidelity to the common interest of the insured as well as itself in determining whether to accept or reject an offer of settlement. While the insurer may properly give consideration to its own interest, it must in good faith give at least equal consideration to the interest of the insured, and if it fails to do so, it acts in bad faith. Given that duty, to accept [General Southern's] argument would be to authorize insurers to place greater importance on their own interests in the regulation of internal business operations than they place on the interests of their policyholders. This we decline to do. In carrying out its duty to give appropriate consideration to settlement offers of limited duration, an insurer cannot justify its failure to give equal consideration to its insureds' interests by relying on internal operating procedures promulgated by the insurer when the effect of such procedures is to prevent the insurer from giving the settlement offer that consideration.

(citations and quotation marks omitted); *Wade*, 483 F.3d at 666 ("The 'real question,' according to the court, is 'the degree of consideration which an insurer must give to those interests of the insured which conflict with its own.'" (quoting *Bollinger,* 449 P.2d at 510)). Shelter did not give Mr. Printup's interest the same consideration as its own or it would have set up an appropriate system to handle time-sensitive settlement offers.

The critical issue in determination of liability therefore is whether Mr. Printup's exposure to the excess judgment was caused by Shelter's negligent conduct or by any arbitrary conduct on the part of Ms. Roberts, as was the case in *Wade*. In this regard, the district court found that "[t]he April 11, 2002 letter . . . was a time-sensitive demand letter that created a duty for Shelter to act without

-13-

negligence in handling the offer." Order at 9 ¶ 2. It then concluded that "[u]pon consideration of all of these factors and the factual findings issued by the court above, the court determines that Shelter breached a duty to defendant when it failed to respond to plaintiff's April 11, 2002 letter within ten days." *Id.* at 13 ¶ 13. In other words, Shelter's negligent failure to address Ms. Roberts' offer to settle prior to the expiration of the statute of limitations on filing the lawsuit was "unjustified" within the meaning of *Sloan*, 521 P.2d at 251. Nevertheless, the district court invoked *Wade* to support its conclusion that Shelter was not liable for the excess judgment, reasoning that "[a]llowing Plaintiff to recover for Shelter's mistake in this instance would promote the situation that *Wade* warned against: it would permit bad faith or negligence in the insurance milieu to become a game." Order at 15 ¶ 18 (internal quotations and brackets omitted). For that reason, it required Ms. Roberts to show a sufficient change of circumstance between the time that the deadline of her offer expired and the time that she declined Shelter's offer.

The district court's reliance on *Wade* was misplaced. Unlike *Wade*, in this case Shelter's negligence, not any semblance of impropriety on the part of Ms. Roberts, resulted in Mr. Printup's exposure to the excess judgment. The facts of this case do not trigger the concern we had in *Wade*, which was "to avoid creating the incentive to manufacture bad faith claims by shortening the length of the settlement offer, while starving the insurer of the information needed to make a

-14-

fair appraisal of the case." *Id.* at 669. The injured party in *Wade* imposed arbitrary settlement deadlines and deprived the insurer of information in order to hamper the insurer's ability to investigate the accident. *See id.* at 671. The evidence was clear in that case that the insurer acted reasonably, not negligently or in bad faith, and did not cause the insured's damages; instead, the delay in accepting the offer was attributable *entirely* to the injured party's manipulation of the insurer. *See Wade*, 483 F.3d at 672-73. We therefore concluded that the insurer was not liable for the insured's exposure to excess damages.

Whether a third party's intervening cause produced the injury in question is a defense for which the defendant bears the burden of proof. *See Worden v. Union Gas System, Inc.*, 324 P.2d 513, 514 (Kan. 1958). Unlike in *Wade*, in this case Shelter provided no evidence raising any concern that Ms. Roberts imposed an arbitrary deadline or that she provided insufficient information to Shelter for it to make a fair appraisal of the case. In fact, the district court itself distinguished the circumstances of this case from those in *Wade*. *See*, *e.g.*, Order at 14 ¶ 17 ("This case is factually distinguishable from both examples given in *Wade*."); *id.* at 7, ¶ 26 ("[T]he court finds that plaintiff did not intentionally send her claim to the wrong office or artificially and unnecessarily shorten Shelter's available response time in order to set up or manufacture a bad faith claim."). Ms. Roberts' ten-day deadline contained in her time-sensitive offer was reasonable under the circumstances and standard in the industry. *See* Order at 15 ("In light of the

statute of limitations on her claim, plaintiff reasonably set a ten-day deadline."); Aplt. App. at 78-79 (Shelter's witness testified that reasonable time-sensitive settlement offers are standard in the industry).[5]  Equally important, the record discloses that the delay resulted in a change of circumstances to the detriment of Ms. Roberts – her unnecessary exposure to costs and attorneys fees, and an unwanted lawsuit against a family member.  These findings support the conclusion that Ms. Roberts did not cause the lawsuit to be filed against Mr. Printup as the injured party did in *Wade*.  Rather, based on the district court's findings, it is apparent that it was Shelter's failure to implement a system to handle reasonable time-sensitive offers in negligent disregard of its insured's interest that exposed Mr. Printup to damages in excess of policy limits.

We note that in determining Ms. Roberts was not entitled to recover the excess judgment from Shelter, the district court said that "[w]hile this does not present a clear case where plaintiff 'manufactured' a lawsuit, she appeared to be

---

[5] As we held in *Wade*, "there are a number of reasons why an insurer's delay in attempting to settle a claim might set up a natural and continuous sequence of events that causes a claimant to reject a policy-limits settlement offer that he would have accepted earlier."  *Wade*, 483 F.3d at 674.  The expenses, time, and resources invested in preparing for trial is just one example.  *See id.* Here, Ms. Roberts reasonably set a ten-day limit on her offer, and the expiration of the statute of limitations required her to file the lawsuit against her son. Moreover, she became obligated to pay a portion of her recovery to her attorney once the lawsuit was filed.  These events caused a change in Ms. Roberts' circumstances as a direct result of Shelter's negligence, unlike the situation in *Wade*.

-16-

eager to capitalize on Shelter's mistake." Order at 14 ¶ 17. Specifically, the district court faulted Ms. Roberts because she "filed suit before the deadline passed . . . and elected to effect service three days after the deadline rather than following up with Shelter to see why she had not received a response." *Id.*[6]

Without reference to any Kansas authority to support its conclusion, the district court created an additional burden on claimants to follow up with insurers who have failed to timely respond to, or even acknowledge, their offers before filing a lawsuit against them for negligent refusal or delay in accepting a bona fide settlement offer. We have found no support for the district court's novel construction in either Kansas precedent or in ours. Therefore, we conclude that the district court erred in imposing such a burden on Ms. Roberts.

Based on the foregoing, we hold that, contrary to the district court's conclusion, the facts of this case do not raise a suspicion of the "cat-and-mouse" game between claimants and insurers cautioned against in *Wade*. *See Wade*, 483 F.3d at 669-670. Shelter's negligence was the cause of Printup's exposure to the excess judgment because it necessitated Ms. Roberts' filing of the lawsuit against Printup to protect herself against the running of the statute of limitations.

Accordingly, we **REVERSE** and **REMAND** to the district court to enter judgment in favor of Ms. Roberts.

---

[6] There is nothing in the record to show whether Shelter made any effort to negotiate above its policy limits to account for the additional loss to Ms. Roberts.