**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 10, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JERRY L. WADE, II and NINH
NGUYEN,

        Plaintiffs - Appellants,

    v.

EMCASCO INSURANCE
COMPANY,

        Defendant - Appellee.

Nos. 05-3044 and 05-3054

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 03-CV-1276-JTM)**

---

Patrick B. Hughes of Adams & Jones, Chartered, Wichita, Kansas (N. Russell
Hazlewood of Graybill & Hazlewood L.L.C., Wichita, Kansas with him on the
briefs) for Plaintiff-Appellant Ninh Nguyen.

William J. Graybill of Graybill, Witcher & Ambrosier, Elkhart, Kansas for
Plaintiff-Appellant Jerry L. Wade, II.

Stephen E. Robison (Lyndon W. Vix with him on the brief) of Fleeson, Gooing,
Coulson & Kitch, L.L.C., Wichita, Kansas for Defendant-Appellee EMCASCO
Insurance Company.

---

Before **MURPHY**, **EBEL**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

It is well settled in Kansas that an insurance company owes to its insured a duty to act in good faith and without negligence in the settlement of third-party claims. When an insurer negligently or in bad faith declines a settlement offer within the policy limits, takes the case to trial, and a verdict is rendered against the insured in excess of policy limits, the insurer is liable to the insured for the excess judgment. *See Bollinger v. Nuss*, 449 P.2d 502, 508 (Kan. 1969). This case involves the application of this principle to an insurer's delay in acceptance of a settlement offer, and arises under what we trust is an unusual set of undisputed facts: the plaintiff in a tort suit against the insured demanded a policy-limits settlement shortly after an automobile accident where liability and causation were vigorously disputed, offered but did not provide relevant medical records, withdrew the settlement offer before giving the insurance company the medical records or providing medical releases, and then rejected the insurance company's policy-limits settlement offer—tendered the day after the insurance company received the medical records—solely because the plaintiff hoped to recover a much larger award on a bad-faith claim. We hold that the district court was correct to grant summary judgment in favor of the insurer on such a claim, both as to the insured and as to the tort plaintiff, to whom the insured assigned his rights against the insurer.

# I. Background

Because this case arises on summary judgment, we must resolve all factual disputes and draw all reasonable inferences in favor of the nonmoving party. *Roberts v. Printup*, 422 F.3d 1211, 1214 (10th Cir. 2005). The following facts are undisputed.

This case arose from a tragic automobile accident in which a vehicle driven by Jerry L. Wade, II, collided with a minivan driven by Loan Vu, in which her husband, Ninh Nguyen, was a passenger. The accident occurred on February 23, 2001, at a four-lane intersection controlled by a traffic signal. Ms. Vu was proceeding northbound through the intersection and Mr. Wade was heading eastbound. One driver must have failed to stop at a red light. Ms. Vu maintained that she did not stop at the intersection because she had a green light. She could not say, however, whether there was traffic coming in the opposite direction because she does "not pay attention to the other direction of the street." Vu Dep. 64–65, App. 607. Mr. Wade claimed that he was stopped at a red light and proceeded through the intersection only after the light turned green. Witnesses to the accident also disagreed as to who had the green light. Susan Schrag reported that Mr. Wade entered the intersection against a red light, but Sheldon (Seth) Turner, a friend and co-worker of Mr. Wade who happened to be in a nearby car, claimed that Mr. Wade entered the intersection on a green light. Because the cause of the accident was contested, neither party received a citation.

After the accident, Mr. Wade, Ms. Vu, and Mr. Nguyen were taken to Wesley Medical Center. Ms. Vu and Mr. Wade were treated for relatively minor injuries. Mr. Nguyen was hospitalized for two weeks before being transferred to Wesley Rehabilitation Hospital, where he remained an additional five weeks. Mr. Nguyen suffered a spinal cord injury rendering him tetraplegic or quadriplegic.[1]

Shortly after the accident, Mr. Wade filed a claim under his EMCASCO insurance policy for medical treatment and damage to his car. His policy provided a total of $100,000 coverage for all claimants in an accident. Mr. Wade was placed in contact with Russ Shreves, an EMCASCO adjuster. He completed a claim form in which he stated that he had a green light and the minivan ran the red light.

Less than a week after the accident, while Mr. Nguyen was still in Wesley Hospital, Ms. Vu retained Gary Patterson to represent Mr. Nguyen. On March 13, 2001, Mr. Patterson sent Mr. Shreves a letter in which he advised Mr. Shreves that he represented Mr. Nguyen and that Mr. Nguyen had suffered a spinal cord injury and may be permanently injured, opined that Mr. Nguyen's damages would exceed one million dollars, and inquired as to the limits of Mr. Wade's insurance

---

[1] The district court stated that Mr. Nguyen was rendered tetraplegic; at various points in the record he is described as quadriplegic or paraplegic. We will use whichever term is used in the record at the relevant point. Nothing in this case turns on the precise nature of Mr. Nguyen's condition.

policy. Mr. Patterson followed up his letter with a phone call to Mr. Shreves. Mr. Shreves assigned the investigation to an outside adjuster, Kyle Buck.

As part of his investigation, Mr. Buck was instructed to gather statements from the insured and witnesses. He interviewed Mr. Wade and Mr. Turner. During his interview, Mr. Wade explained that while he was at the hospital, he asked a hospital chaplain about the condition of the minivan's occupants and that the chaplain informed him that they were okay and would be released. This gave rise to suspicion that Mr. Nguyen's quadriplegic condition was not attributable to the accident. Mr. Buck also attempted, unsuccessfully, to obtain a statement from Ms. Schrag. He called Ms. Schrag eleven times between April 4, 2001, and June 29, 2001, and left seven messages for her. Although she returned one of his phone calls when he was out of the office, the two did not connect.

Meanwhile, Mr. Patterson obtained an authorization for release of medical information from Mr. Nguyen on March 29, 2001. On April 6, 2001, Mr. Patterson requested from Wesley Medical Center a complete itemization of Mr. Nguyen's medical expenses. By May 1, 2001, Mr. Patterson had forwarded Mr. Nguyen's medical bills to Mr. Shreves. In a letter to Mr. Shreves dated May 1, 2001, Mr. Patterson also offered to "settle all claims against [the] insured for prompt payment of [the] insured's policy limits" and explained that he had "ordered the medical records from Wesley Hospital and Wesley Rehabilitation Hospital and [would] forward same to [Mr. Shreves] upon receipt." *Id.* at 793.

Based on Mr. Patterson's promise to send the medical records, Mr. Shreves did not attempt to obtain Mr. Nguyen's records himself.

Mr. Patterson received Mr. Nguyen's medical records from Wesley Rehabilitation Hospital, reviewed them, and forwarded them to Mr. Shreves on May 21, 2001. In a letter sent on May 21, 2001, Mr. Patterson said, without qualification, "I am also enclosing the medical records for Ninh Nguyen with this letter," and advised Mr. Shreves "that the policy limits settlement offer will be withdrawn on June 15, 2001." *Id.* at 794. Although this letter purported to include all of Mr. Nguyen's medical records, none of Mr. Nguyen's records from his two-week stay at the Wesley Medical Center were included. In fact, Mr. Patterson did not receive Mr. Nguyen's medical records from Wesley Medical Center until June 28, 2001, nearly two weeks after the settlement offer expired. And Mr. Patterson did not forward those records to Mr. Shreves after he received them on June 28. Instead, Mr. Patterson waited four months, until all settlement offers had expired, before sending the Wesley Medical Center records.

Mr. Patterson's May 21, 2001, letter also informed Mr. Shreves that Mr. Patterson had successfully contacted Ms. Schrag, who maintained that Mr. Wade had entered the intersection against a red light. Although Mr. Patterson volunteered to set up a meeting with Ms. Schrag and an EMCASCO representative, Mr. Shreves declined Mr. Patterson's offer, preferring that Mr. Buck make independent arrangements to interview Ms. Schrag. Although Mr.

Buck continued his attempts to contact Ms. Schrag, all attempts to contact her before the June 15, 2001, settlement demand deadline were unsuccessful. On either June 5 or July 5, 2001, Mr. Shreves sent a letter to Mr. Wade informing him that Mr. Nguyen had filed a claim in excess of the policy limits. Mr. Shreves explained that "[t]he accident is still under active investigation" and that EMCASCO had thus far been unable to obtain a statement from one of the witnesses. *Id.* at 757.

On August 2, 2001, Mr. Patterson sent Mr. Shreves a copy of a witness statement obtained from Ms. Schrag on June 25, 2001. At that time, Mr. Shreves told Mr. Buck to stop attempting to contact Ms. Schrag, as he had already received a statement. Mr. Patterson did not explain why he waited five weeks before forwarding the statement to EMCASCO. In the August 2 letter, Mr. Patterson again offered to settle Mr. Nguyen's claim for the policy limits.

On August 7, 2001, Mr. Shreves called attorney David Cooper, who had been hired to defend Mr. Wade at EMCASCO's expense. On August 20, 2001—less than three weeks after the second settlement offer and before Mr. Cooper had an opportunity to review Mr. Nguyen's medical records—Mr. Patterson sent Mr. Shreves a letter withdrawing his second policy limits settlement demand. Mr. Patterson also enclosed a copy of the Petition filed against Mr. Wade and "agree[d] to delay serving th[e] Petition on [Mr. Wade] to give [EMCASCO] time to make a settlement offer on this case should

[EMCASCO] decide to do so." *Id.* at 765. Mr. Shreves promptly forwarded that letter to Mr. Cooper with a note explaining that "[t]his is one of those situations that may not allow us to wait for all of the facts [because] the threat of excess judgment and 'bad faith' may force us to proceed more hastily than we would prefer." *Id.* at 767.

Although by August 2001 it had become relatively clear, despite Mr. Wade's disclaimer of liability, that there was a 50-50 chance that Mr. Wade ran the red light, as questions about the cause of Mr. Nguyen's injuries started to emerge. In particular, Mr. Cooper was concerned that Mr. Nguyen's quadriplegia was caused by something other than the collision. Mr. Cooper explained that he "did not have the report of the ambulance service from the site of the accident to the hospital, nor did [he] have any of the records of the emergency room treatment or the immediate stay at the hospital before [Mr. Nguyen's] transfer to the rehab hospital" and therefore he "didn't know what information there was that causally connected the accident to the paraplegia [and] whether or not there could have been any claim for negligence or malpractice by either the emergency care providers, either in the ambulance or at the hospital or in the course of the stay at the hospital." Cooper Dep. 66–67, App. 695. To cure this lack of information, Mr. Cooper asked Mr. Patterson for medical releases so that Mr. Cooper could obtain the missing medical records. Mr. Cooper sent Mr. Patterson a letter on October 22, 2001, explaining his understanding that Mr. Patterson agreed to

"withhold service upon Mr. Wade pending collection of medical records from the initial treating hospital and emergency medical service" and explaining the necessity of "assur[ing] that Mr. Nguy[e]n's injuries were a result of the motor vehicle accident and not the result of any medical negligence or accidents that may have happened after he was transported from the scene of the accident." App. 818.

Mr. Patterson sent Mr. Cooper a medical release, which Mr. Cooper submitted to Wesley Hospital. But the release was signed by Mr. Patterson rather than the patient. The hospital apparently found the release invalid, and did not furnish the records. Unable to obtain the medical records directly from Wesley Hospital, Mr. Cooper called Mr. Patterson on October 30, 2001, and asked him whether he had the emergency treatment records. Mr. Patterson located the emergency records in his own files and agreed to send them to EMCASCO. Upon learning that Mr. Patterson would forward the medical records, Mr. Cooper sent an e-mail to an EMCASCO supervisor, Joel McFadden, stating that Mr. Patterson "did have the ER records and would be sending copies today" and remarking that "if [Mr. Patterson] had done this in the first place, this file would be closed by now." *Id.* at 819. Upon receiving the emergency medical records, Mr. Cooper sent a summary to Mr. McFadden, who immediately authorized a settlement offer of the policy limit. Mr. Wade, while maintaining that he was not at fault, agreed

to the settlement.  Mr. Cooper conveyed the settlement offer to Mr. Patterson on November 1, 2001.

Because Mr. Cooper interpreted Mr. Patterson's August 20, 2001, letter as soliciting a policy limits offer, he believed Mr. Patterson would accept the policy limits offer "as soon as [EMCASCO] had authorization to extend the . . . offer." Cooper Dep. 153, App. 714.  But by this time, Mr. Nguyen's attorney was contemplating pursuing a bad faith claim against EMCASCO, which could amount to millions, instead of the policy-limits offer of $100,000.  Although his August 20 letter invited EMCASCO to make a settlement offer, Mr. Patterson admitted in his later deposition that he would not have accepted a settlement for the policy limits on August 20.  Mr. Patterson explained that by August 20, he "was fairly certain that they had been acting in bad faith" and that a "policy limit [settlement] would not have done it, but some amount would have settled it at [that] point in time."  Patterson Dep. 95, App. 741. Accordingly, without explicitly disclaiming an intention to settle for the policy limits, Mr. Patterson never responded to EMCASCO's November 1, 2001, settlement offer.

Instead, Mr. Patterson enlisted new co-counsel, Jacob Graybill, an attorney with experience in bad faith claims against insurance companies.  Mr. Patterson admitted in his deposition that he did not recall any additional work having been done between August and November that uncovered additional information relevant to Mr. Nguyen's claim against Mr. Wade.  Nonetheless, Mr. Graybill

-10-

rejected the settlement on behalf of Mr. Nguyen.  The plan was to reject the settlement offer and negotiate an excess judgment directly with Mr. Wade on the understanding that Mr. Wade would convey to Mr. Nguyen his right to pursue a bad faith claim against EMCASCO, in exchange for being held harmless on the judgment.  On November 19, 2001, Mr. Graybill sent a letter to Mr. Cooper rejecting the settlement offer:

> The legal test for whether we can recommend that Mr. Nguyen accept $100,000 to settle Mr. Wade's liability for his injury is whether from the facts and circumstances a *prima facie* case emerges that EMC, as a result of negligence or lack of good faith, failed to accept either of Mr. Nguyen's offers.  With all due respect, it appears in this case that is exactly what has occurred. . . . [O]ne must recognize the scenario presents a pattern of delay, which EMC has attempted to obscure with transparently disingenuous excuses.  Viewed from that perspective, it is possible, and in my opinion probable, a fact finder will find that EMC acted with little, if any, regard for the interest of Mr. Wade, and engaged in a reckless, mindless, refusal to apply reason in its refusal to timely accept Mr. Nguyen's policy limit settlement offers.  Consequently, Mr. Patterson and I would be guilty of malpractice if we were to advise Mr. Nguyen to accept $100,000 that has been offered on Mr. Wade's behalf . . . .

App. 833.  In the letter, Mr. Graybill also suggested that EMCASCO, Mr. Wade, and Mr. Nguyen negotiate a fair settlement, without regard to who will pay it and irrespective of the policy limits, and allow Mr. Wade to confess judgment and assign his contractual rights to Mr. Nguyen.  Mr. Graybill proposed a settlement in the amount of $3 million.

At this time, Mr. Wade had virtually no assets other than his potential claim against the insurance company.  He had gone bankrupt five years before the

accident. Subsequently, he purchased a home with an appraised value of $49,300, on which he had a $45,400 mortgage.

Because Mr. Cooper could not agree to enter into negotiations on behalf of EMCASCO, he began to prepare Mr. Wade's case for trial. On June 20, 2002, on Mr. Cooper's advice, Mr. Wade confessed judgment in the amount of $3,150,000 and assigned his rights to Mr. Nguyen for any bad-faith claim, in exchange for a covenant from Mr. Nguyen not to execute the judgment. Following entry of the $3,150,000 judgment, EMCASCO paid its policy limit of $100,000. Of this sum, $25,000 went to Ms. Vu, the driver of the other vehicle, and $75,000 went to Mr. Nguyen.

Mr. Nguyen, in his capacity as assignee of Mr. Wade's contractual rights against the insurance company, filed a lawsuit against EMCASCO in state court. EMCASCO promptly removed the case to the United States District Court for the District of Kansas based on diversity of citizenship. Mr. Nguyen claimed that EMCASCO breached its duty of good faith owed to Mr. Wade under his insurance policy by failing to use due care in investigating and settling Mr. Nguyen's claim and failing to give Mr. Wade's interest equal consideration to its own interest. Mr. Nguyen claimed that "[a]s a foreseeable and direct consequence of EMCASCO's" breach, a judgment in excess of $3 million was entered against Mr. Wade. *Id.* at 53.

-12-

On the recommendation of Mr. Patterson and Mr. Jacob Graybill, Mr. Wade hired Mr. William Graybill to represent him against EMCASCO. Mr. Wade filed a motion for joinder in Mr. Nguyen's suit against EMCASCO, which the district court granted. In his complaint, Mr. Wade argued that EMCASCO breached its contract by failing to carefully and diligently investigate Mr. Nguyen's claim, by not keeping Mr. Wade informed of relevant facts, and by not providing an adequate defense during the pendency of Mr. Nguyen's lawsuit against Mr. Wade. He further claimed that the same conduct was a breach of EMCASCO's duty of good faith and fair dealing. Mr. Wade added that EMCASCO was negligent in failing to adequately respond to Mr. Nguyen's settlement offers; that EMCASCO committed fraud by intentionally failing to disclose that Mr. Cooper, the lawyer assigned to represent Mr. Wade, had a longstanding employment relationship with EMCASCO, thereby creating a conflict of interest; and that EMCASCO tortiously interfered with Mr. Wade's attorney-client relationship with Mr. Cooper. Although Mr. Wade had virtually no assets and therefore suffered no direct pecuniary loss from entry of the excess judgment, the Plaintiff's theory of damages was that the judgment injured Mr. Wade's credit and prevented him from

obtaining a second mortgage on his home and from selling his home,[2] and caused him to experience "fear, dread, anxiety and uneasiness."

EMCASCO filed a motion for summary judgment on all claims, which the district court granted. The district court found that "[t]he demand for settlement early in the dispute, its short duration, the contemporaneous existence of significant questions as [to] liability, and the failure of plaintiff's counsel to follow through on commitments to supply necessary medical evidence supporting his client[']s claim" compelled a finding that EMCASCO did not act negligently or in bad faith in waiting to settle Mr. Nguyen's claim until it had obtained all of the medical information. Mem. Op. 16. As to Mr. Wade's claims, the court rejected all of the tort claims, finding that Kansas law does not allow tort actions premised on an insurer's breach of its contractual duty to defend. The court also rejected Mr. Wade's breach of contract and breach of implied covenant of good faith claims because Mr. Wade is not the real party in interest, as he assigned those claims to Mr. Nguyen. Both Mr. Nguyen and Mr. Wade appeal from the district court's order.

---

[2] Although his first mortgage was only slightly under the appraised value of his home and he had filed for bankruptcy five years earlier, Mr. Wade applied to a bank for a second mortgage of $25,000. The bank denied the application for a second mortgage because of something on Mr. Wade's credit report. Mr. Wade did not inquire as to the reason for the denial, but stated in his deposition that he "assumed" that the problem was the judgment against him in the automobile accident case. Wade Dep. 118–19, App. 629.

**II. The Bad Faith Claim Against EMCASCO Brought By Assignee Nguyen**

**A.     Insurance Bad Faith Claims Under Kansas Law**

In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to "'ascertain and apply the state law.'" *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003) (quoting *Huddleston v. Dwyer*, 322 U.S. 232, 236 (1944)); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The federal court must follow the most recent decisions of the state's highest court. *Wankier*, 353 F.3d at 866. "Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." *Id.* In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, *Progressive Cas. Ins. Co. v. Engemann*, 268 F.3d 985, 988 (10th Cir. 2001), appellate decisions in other states with similar legal principles, *United States v. DeGasso*, 369 F.3d 1139, 1148 (10th Cir. 2004), district court decisions interpreting the law of the state in question, *Sapone v. Grand Targhee, Inc.*, 308 F.3d 1096, 1100, 1104–05 (10th Cir. 2002), and "the general weight and trend of authority" in the relevant area of law, *MidAmerica Constr. Mgmt., Inc. v. Mastec N. Am., Inc.*, 436 F.3d 1257, 1262 (10th Cir. 2006) (internal quotation marks omitted). Ultimately, however, the Court's task is to predict what the state supreme court would do. Our review of the district court's interpretation of state law is *de novo*. *Roberts v. Printup*, 422 F.3d 1211, 1215 (10th Cir. 2005). No

party to this case has asked us to certify any question of law to the Kansas

Supreme Court.

The leading case in Kansas defining bad faith claims in the context of an

insurer's failure to settle a third-party claim against the insured is *Bollinger v.*

*Nuss*, 449 P.2d 502 (Kan. 1969). The Kansas Supreme Court explained the

rationale for the doctrine as follows:

> When a claim is made against the insured for an amount in excess of
> the policy coverage, the insurer's obligation to defend creates a
> conflict of interest on its part.  On the one hand, its interests lie in
> minimizing the amount to be paid; on the other, the insured's
> interests, which the insurer is supposedly defending, lie in keeping
> recovery within policy limits, so that he will suffer no personal
> financial loss.  The conflict becomes particularly acute where there is
> an offer of settlement approximating policy limits.  The insured's
> desire to avoid the risk of a large judgment by settling within the
> limits of the policy, regardless of the merits of the claim, would
> compel him, were he in charge of settlement negotiations, to accept
> the offer.  The insurer's interests, on the other hand, are prompted by
> its own evaluation of the liability aspects of the litigation and a
> desire not to expose itself to payments which do not adequately
> reflect the dangers that might be involved in pursuing the case to
> trial.  When the settlement offer approaches policy limits, the insurer
> has a great deal less to risk from going to trial than does the insured,
> because the extent of its potential liability is fixed.

*Id.* at 510.  The "real question," according to the court, is "the degree of

consideration which an insurer must give to those interests of the insured which

conflict with its own."  *Id.*  After canvassing the alternatives, the *Bollinger* court

determined that "the insurer may properly give consideration to its own interests,

but it must also give at least equal consideration to the interests of the insured."

-16-

*Id.* "The result," the court explained, is that "the insurer must conduct itself with that degree of care which would be used by an ordinarily prudent person in the management of his own business, with no policy limits applicable to the claim." *Id.* at 511. "Something more than mere error of judgment is necessary to constitute bad faith." *Id.* at 514. Although the court held that an insurer is bound to conduct itself both in good faith and without negligence, it considered the difference in these two formulations "more a difference in verbiage than results." *Id.* at 509. Thus, many of "the same factors are generally relied upon in those cases finding a breach of good faith as in those finding negligence on the part of the insurer." *Id.* at 511.

The insurer's duty in these cases runs only to its insured; it has no duty to the third-party plaintiff. The Kansas Supreme Court, however, has held that the insured may assign his claim against the insurance company to another party. *Glenn v. Fleming*, 799 P.2d 79, 90–91 (Kan. 1990). Here, the insured, Jerry Wade, assigned his rights to sue the insurance company for any bad-faith claim to Ninh Nguyen, the third-party tort plaintiff, in exchange for a covenant from Mr. Nguyen not to execute the judgment. Thus, it is Mr. Nguyen—not Mr. Wade—who is asserting Mr. Wade's rights against EMCASCO.

The *Bollinger* court stressed that "the question of liability depends upon the circumstances of the particular case and must be determined by taking into account the various factors present, rather than on the basis of any general

-17-

statement or definition." *Id.* at 512. The court then listed certain factors that should be considered in "deciding whether the insurer's refusal to settle constituted a breach of its duty to exercise good faith," *id.*:

> "(1) the strength of the injured claimant's case on the issues of liability and damages; (2) attempts by the insurer to induce the insured to contribute to a settlement; (3) failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; (4) the insurer's rejection of advice of its own attorney or agent; (5) failure of the insurer to inform the insured of a compromise offer; (6) the amount of financial risk to which each party is exposed in the event of a refusal to settle; (7) the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and (8) any other factors tending to establish or negate bad faith on the part of the insurer."

*Id.* (quoting *Brown v. Guarantee Ins. Co.*, 319 P.2d 69, 75 (Cal. Dist. Ct. App. 1957)). Significantly, the court noted that "[s]everal" of the listed factors were not relevant to the case at hand, *id.*, and in light of the eighth, catch-all factor ("any other factors tending to establish or negate bad faith on the part of the insurer"), it is evident that the list of factors is neither exclusive nor necessarily pertinent in every case.

*Bollinger* involved an insurance company's decision to take a case to trial rather than to accept a policy-limits settlement offer. This case, by contrast, involves an insurance company's delay in accepting a policy-limits settlement offer. Approximately two months after Mr. Nguyen's last clear settlement offer apparently expired, and well before the case would have gone to trial, EMCASCO

-18-

offered to settle for the policy limits. Mr. Nguyen declined to accept the offer at that time. While the first seven *Bollinger* factors apply to cases involving delay in acceptance of a settlement offer as well as cases involving refusal to settle, *Roberts*, 422 F.3d at 1219 & n.5, delayed acceptance cases necessarily implicate "other factors tending to establish or negate bad faith on the part of the insurer," *Bollinger*, 449 P.2d at 512.

In *Glenn v. Fleming*, 799 P.2d 79 (Kan. 1990), the Kansas Supreme Court applied the *Bollinger* bad faith doctrine to a delayed acceptance case. The third-party plaintiff in that case made a policy-limits offer early in the litigation process, when discovery had scarcely begun. *Id.* at 82. Early investigative reports suggested that the plaintiff, rather than the insured, had caused the accident. *Id.* at 81. The insurance company requested the plaintiff's medical records and the plaintiff's attorney said that he would send them, but at the time of the offer had not done so. *Id.* at 86. The insurance company rejected the settlement offer and made a much smaller counter-offer. *Id.* at 82. When additional evidence later surfaced, the insurance company made a policy-limits offer, which the plaintiff refused. *Id.* at 83. Following a substantial verdict at trial, the insured assigned his bad faith claim to the third-party plaintiff. *Id.* at 84. The trial court granted summary judgment in favor of the insurance company, which the Kansas Supreme Court affirmed. *Id.* at 84, 86. The trial court held that "there was no bad faith in refusing to accept the [settlement] offer under these

circumstances." *Id.* at 86. "The offer was found to be unreasonable because it was premature, had conditions attached to it, and was only open for two weeks." *Id.*

Similarly, in *Covill v. Phillips*, 452 F. Supp. 224 (D. Kan. 1978), the district court, applying the *Bollinger* factors, held that an insurance company was not liable in a bad faith claim based upon its refusal of an early policy-limits settlement offer. *Id.* at 231–33. In *Covill*, the liability of the insured was not in doubt, but the insurance company questioned the amount of damages suffered by the third-party plaintiff. *Id.* at 228, 231. As in *Glenn*, the plaintiff's lawyers promised to provide the company the plaintiff's full medical records, but failed to do so. *Id.* at 228, 231–32. The court found that "it was not unreasonable for State Farm, having voiced its reasonable and specific requests for the medical information it felt was necessary to verify the claimant's injuries, to rely upon the assurances of the plaintiff's attorneys that such information would be forthcoming." *Id.* at 232. Under the circumstances, the court held that the insurer's failure to accept the policy-limits settlement offer "can in no way be viewed as a breach of its duty to its insured." *Id.*

The court held, however, that the company's subsequent conduct did give rise to a bad faith claim. *Id.* at 233–40. During the months after State Farm's initial refusal of the offer, the company became "increasingly aware of the seriousness of [the plaintiff's] injuries," but it made no attempts to initiate

settlement. *Id.* at 234. Indeed, long after the company itself concluded that the claim was worth more than the policy limit, and after the lawyer it hired to represent the insured had repeatedly pleaded with the company to authorize a policy-limits offer, the company continued to offer less than the policy limits. *Id.* at 236. The court concluded:

> [T]here is compelling evidence that by early November, 1975, State Farm did not believe and could not have honestly believed that it had a realistic chance of defeating Larry Covill's claim or keeping any possible judgment within the limits of the policy. Furthermore, the evidence strongly suggests that if State Farm had more aggressively investigated Larry's claim instead of relying past the point of all reason on [plaintiff's counsel] to voluntarily furnish all of the information allegedly necessary for adequate evaluation of the claim it would have known much earlier than November, 1975, that the risk of an excess judgment was great.

*Id.* at 238.

And in *Williams v. American Family Mutual Insurance Co.*, 101 F. Supp.2d 1337 (D. Kan. 2000), the district court, applying Kansas law, granted summary judgment in favor of the insurance company in a bad faith claim, despite refusal of a settlement offer and an attendant excess judgment, where the insurer made a reasonable request for additional documentation and the plaintiff's attorney failed to supply it. *Id.* at 1342; *see also Smith v. Blackwell*, 791 P.2d 1343, 1347–49 (Kan. Ct. App. 1990) (upholding bad faith claim where plaintiff's counsel "furnished all requested medical reports, agreed to extend time if significant

progress toward settlement was being made, and did not file suit 'precipitously,'" but insurer did not offer to settle until after suit was filed).

Courts in other states have rendered similar decisions. In *Miel v. State Farm Mutual Automobile Insurance Co.*, 912 P.2d 1333, 1336 (Ariz. Ct. App. 1995), a lawsuit against the insured resulted in an excess judgment. The insurer was then sued for delaying acceptance of the plaintiff's settlement offer until after it had expired. *Id.* The Arizona Court of Appeals reversed a decision against the insurer, holding that it was error for the trial court to refuse to allow evidence regarding the plaintiff's motives in setting a time limit for the settlement offer. *Id.* at 1339–40. The court explained that "the reasons the Plaintiff adhered to the deadline are relevant to whether the insurer acted unreasonably." *Id.* at 1339. The court emphasized that "[w]hat is reasonable on the part of the insurer . . . must be judged in light of all the facts surrounding the demand." *Id.* "Even though [the insurer] does not claim that the deadline was so short that it could not have been met, the reasons for a specific deadline may be relevant to whether the claimant has 'set up' the insurer for a claim of bad faith." *Id.*

Similarly, in *Adduci v. Vigilant Insurance Co.*, 424 N.E.2d 645 (Ill. App. Ct. 1981), the Illinois Court of Appeals upheld dismissal of a bad faith claim where the insurer attempted to accept a settlement offer forty days after the offer expired. *Id.* at 649. The court explained:

No facts sufficiently indicate why the claimants found it impossible to accept the offer at this time, so as to fairly place the blame for failure of settlement upon Insurer. The allegations of the complaint simply do not show why the offer would have been good on May 7, 1976, but was not acceptable on June 18, 1976.

*Id.* at 649; *see also Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 232–33 (3d Cir. 2003) (reversing summary judgment in favor of insurer where delay in settlement imposed substantial litigation costs upon the plaintiff, leading the plaintiff to reject the later offer); *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 934 P.2d 65, 92 (Kan. 1997) ("A claimant may be more willing to negotiate with the insured before undertaking the risk and expense of a trial.").

In light of these decisions, we agree with the district court's observation that courts should exercise caution "when the gravamen of the complaint is not that the insurer has *refused* a settlement offer, but that it has *delayed* in accepting one." Mem. Op. 14 (citing *Adduci*, 424 N.E.2d at 649; *Pavia v. State Farm Mut. Auto. Ins. Co.*, 626 N.E.2d 24, 28–29 (N.Y. 1993)). This caution "arises from the desire to avoid creating the incentive to manufacture bad faith claims by shortening the length of the settlement offer, while starving the insurer of the information needed to make a fair appraisal of the case." *Id.* at 15. As the First Circuit commented in *Peckham v. Continental Casualty Insurance Co.*, 895 F.2d 830, 835 (1st Cir. 1990):

-23-

[T]he doctrinal impetus for insurance bad faith claims derives from the idea that the insured must be treated fairly and his legitimate interests protected. . . . In other words, the justification for bad faith jurisprudence is as a shield for insureds—not as a sword for claimants. Courts should not permit bad faith in the insurance milieu to become a game of cat-and-mouse between claimants and insurer, letting claimants induce damages that they then seek to recover, whilst relegating the insured to the sidelines as if only a mildly curious spectator.

In particular, in light of the purposes of the bad faith cause of action, courts cannot presume that any failure to reach a settlement when the insurer did not meet a deadline unilaterally imposed by the third-party plaintiff—no matter how arbitrary or manipulative the deadline may be—may reasonably be blamed on the insurer.[3] As the New York Court of Appeals has explained:

Permitting an injured plaintiff's chosen timetable for settlement to govern the bad-faith inquiry would promote the customary manufacturing of bad-faith claims, especially in cases where an insured of meager means is covered by a policy of insurance which could finance only a fraction of the damages in a serious personal injury case. Indeed, insurers would be bombarded with settlement offers imposing arbitrary deadlines and would be encouraged to prematurely settle their insureds' claims at the earliest possible opportunity in contravention of their contractual right and obligation of thorough investigation.

---

[3] By the same token, we do not hold that an insurer's attempt to accept an expired offer serves to absolve the insurer of any liability for damages to the insured caused by the insurer's earlier bad faith failure to settle. *S. Gen. Ins. Co. v. Holt*, 409 S.E.2d 852, 858 (Ga. Ct. App. 1991), *vacated on other grounds by S. Gen. Ins. Co. v. Holt*, 416 S.E.2d 274 (Ga. 1992). Under the Kansas Supreme Court's multi-factor approach in *Bollinger*, the jury should consider all relevant factors bearing on the good faith of the insurer, and only when no reasonable jury could conclude that the insurance company acted negligently or in bad faith is the company entitled to summary judgment.

-24-

*Pavia*, 626 N.E.2d at 28–29. It is therefore necessary to take into consideration, in addition to the other pertinent *Bollinger* factors, relevant aspects of the third-party plaintiff's conduct, including any responsibility the plaintiff might have for the insurer's lack of adequate information upon which to judge a proposed settlement offer and the reasons the plaintiff had for declining to entertain an offer after expiration of a deadline.

We now turn to the undisputed facts regarding EMCASCO's delay in accepting Mr. Nguyen's offer of a policy-limits settlement in this case. For convenience, we divide our analysis into two time segments. First, we will consider the period between May 1, 2001, and August 20, 2001, during which Mr. Nguyen formally kept open his policy-limits settlement offer. Then, we will consider the period between August 20, 2001, and November 19, 2001, when Mr. Nguyen rejected EMCASCO's policy-limits settlement offer.

## B.    EMCASCO's Conduct Prior to August 20, 2001

We have no hesitation in affirming the district court's judgment in favor of EMCASCO with regard to the period between May 1 and August 20, 2001. This conclusion appears especially proper in light of the Kansas Supreme Court's pronouncement that "[t]he strength of the plaintiff's case must be gauged as it appeared at the time the offer was refused." *Id.* at 502. During this time period, with one possible exception, none of the pertinent *Bollinger* factors suggests that

EMCASCO breached its duty. The strength of the injured claimant's case was a matter of good faith dispute, both as to liability and as to amount of damages; EMCASCO reasonably relied on opposing counsel's offer to send medical records, and otherwise was properly investigating the circumstances of the accident; the insurer had received no contrary advice from its attorney or agent; and the amount of financial risk to which each party would be exposed in the event of a refusal to settle was unknown. *See Bollinger*, 449 P.2d at 512. The Plaintiff bears much of the responsibility for EMCASCO's lack of information regarding Mr. Nguyen's injuries, because Plaintiff's counsel promised to provide EMCASCO Mr. Nguyen's medical records, yet provided only some of them.

The possible exception involves EMCASCO's apparent failure to inform Mr. Wade of the plaintiff's settlement offer. At this point in time, however, Mr. Wade was insistent that he was not responsible for the accident, he was not yet represented by counsel, and there is no evidence to suggest that failure to inform him affected the course of the litigation. On or about August 7, David Cooper was engaged as Mr. Wade's lawyer, and he immediately communicated with plaintiff's counsel on Mr. Wade's behalf. There is no evidence that, after Mr. Cooper became Mr. Wade's lawyer, he failed to keep Mr. Wade fully abreast of settlement negotiations.

Although no two cases are identical, as of August 20, 2001, this case is remarkably similar to *Glenn*, *Covill*, and *Williams*. In each of those cases, the

plaintiff placed a deadline on a settlement offer while failing to comply with a promise to provide relevant medical records. In each case, the court concluded that the insurer had not breached its duty to the insured by not accepting the offer, despite subsequent excess judgments. We are confident that the Kansas Supreme Court would reach the same conclusion here.

## C.   EMCASCO's Conduct After August 20, 2001

In many respects, the situation remained the same after August 20. Plaintiff's counsel continued to make it difficult for the defense to obtain the relevant medical records. Mr. Nguyen's lawyer, Mr. Patterson, obtained and reviewed the records of Mr. Nguyen's two-week stay at Wesley Medical Center on June 28, but despite his promise—and his written assurance in a letter dated May 21 that he had already provided all medical records—he waited four months, until all settlement offers had expired, to provide these records to the defense. Nor did he provide any records pertaining to the ambulance service. The medical and ambulance records were relevant because, as Mr. Cooper explained, without them he "didn't know what information there was that causally connected the accident to the paraplegia [and] whether or not there could have been any claim for negligence or malpractice by either the emergency care providers, either in the ambulance or at the hospital or in the course of the stay at the hospital." Cooper Dep. 67, App. 695.

Mr. Cooper then asked Mr. Patterson for medical releases so that he could obtain the records directly from the institutions. App. 817. He sent a letter to Mr. Patterson explaining why he needed to examine the records, and reminding Mr. Patterson of his agreement to withhold service on Mr. Wade until the records had been examined. *Id.* at 818. Mr. Patterson sent Mr. Cooper a release, but it was signed by Patterson himself rather than the patient, and was therefore not accepted by Wesley Hospital. *Id.* at 801. Mr. Cooper contacted Mr. Patterson again, and this time—on October 30—Mr. Patterson sent the records he had promised four months before. Mr. Cooper immediately contacted EMCASCO, EMCASCO authorized a policy-limits settlement, and Mr. Cooper conveyed the offer to Mr. Patterson on November 1. *Id.* at 822. He testified that he believed the offer would be accepted. He also wrote to an EMCASCO supervisor that if Mr. Patterson had only sent the records "in the first place, this file would be closed by now." *Id.* at 819.

In some other respects, however, the circumstances changed after August 20. The possibility of a successful defense based on who ran the red light diminished when the disinterested eyewitness stated unequivocally, on tape, that she had seen Mr. Wade enter the intersection against a red light. The focus shifted from the cause of the accident to the medical cause of the injuries—whether they were a result of the accident itself, a preexisting condition, or negligence by medical professionals or the ambulance service. Moreover, as

-28-

the extent of Mr. Nguyen's injuries became apparent, the defense had reason to believe that even if Mr. Wade were held responsible for only a small portion of the injury, the damages would still exceed the policy limit. The EMCASCO agent expressed concern to Mr. Cooper that "[t]his is one of those situations that may not allow us to wait for all of the facts [because] the threat of excess judgment and 'bad faith' may force us to proceed more hastily than we would prefer." App. 767.

Most significantly, Appellant argues that it ceased to be reasonable for the insurer to rely on plaintiff's counsel's promise to provide the medical records. *See Covill*, 452 F. Supp. at 238 ("[I]f State Farm had more aggressively investigated [the plaintiff's] claim instead of relying past the point of all reason on [plaintiff's counsel] to voluntarily furnish all of the information allegedly necessary for adequate evaluation of the claim it would have known much earlier . . . that the risk of an excessive judgment was great."). Kansas law requires insurers to promptly conduct reasonable, good-faith investigations of claims arising under their policies. Kan. Stat. Ann. § 40-2404(9)(b)–(c). Indeed, a factor in deciding whether an insurer acted in bad faith in rejecting a settlement offer is whether the insurer failed "'to properly investigate the circumstances so as to ascertain the evidence against the insured.'" *Levier v. Koppenheffer*, 879 P.2d 40, 46 (Kan. Ct. App. 1994) (quoting *Bollinger*, 449 P.2d at 502 (other quotation marks omitted)).

We are not necessarily persuaded that the evidence supports a conclusion that EMCASCO violated its duty to Mr. Wade with regard to efforts to obtain the medical records. It is not clear to us that the Kansas Supreme Court would wish to reward plaintiffs for inducing insurers to rely on promises that plaintiffs never keep; such a holding could create perverse incentives for gamesmanship. *See Peckham*, 895 F.2d at 835. And once Mr. Cooper became involved in the case, he ceased to rely on Plaintiff's counsel to supply the records; he attempted to obtain the records directly from the hospital. But in order to do so, he had to obtain medical releases, and Plaintiff's counsel supplied legally defective releases. We hesitate to conclude that EMCASCO could be held responsible under those circumstances.

Nevertheless, Appellant maintains that these circumstances after August 20, interpreted in the light most favorable to the party opposing summary judgment, were sufficient to go to the jury on a claim of negligence. We disagree and conclude that, in light of the Plaintiff's manipulation of the settlement offer deadline, the Kansas Supreme Court would hold that no reasonable jury could find EMCASCO's delay was responsible for the parties' failure to reach a policy-limits settlement.

First, EMCASCO, through Mr. Cooper, had no reason to believe that Plaintiff's counsel would refuse to accept a settlement offer on account of the additional delay between August 20 and November 1. The Plaintiffs had

extended their offer before, and circumstances had not changed in any relevant respect. To be sure, Mr. Patterson stated in his deposition that he would not have accepted a policy-limits offer after August 20. Patterson Dep. 97, App. 741. But in his letter of August 20 to Mr. Cooper, he expressly agreed not to serve process against Mr. Wade "to give [EMCASCO] time to make a settlement offer on this case should [the company] desire to do so." App. 765. Mr. Cooper testified that he interpreted this letter as soliciting a policy-limits offer and that he believed Mr. Patterson would accept such an offer when it was made. Cooper Dep. 153–55, App. 714. Appellant has tendered no evidence that this belief was insincere, unfounded, or unreasonable.

More importantly, the undisputed evidence in the record shows that Plaintiff's counsel's sole reason for rejecting EMCASCO's November 1 offer was his hope to pursue a bad faith claim against the insurer. Mr. Patterson candidly admitted that he managed the Nguyen affair, from its inception, with a bad faith claim in mind. As he expressed it in his deposition: "Pursuit of a bad faith claim is kind of a process that starts on the first day of the accident, and then winds up at some point later." Patterson Dep. 115, App. 744. He explained that by August 20—a date when we have concluded no reasonable juror could find that EMCASCO had acted in bad faith—he "was fairly certain that they had been acting in bad faith" and that for this reason a "policy limit [settlement offer] would not have done it." *Id.* at 95, App. 741. *Cf. Miel*, 912 P.2d at 1339–40

-31-

(reversing a bad faith judgment because the trial court failed to allow evidence that the plaintiff's reason for imposing a deadline was to "set up" a bad faith claim). Mr. Patterson admitted that he could not recall having done any additional work or uncovering any additional information relevant to Mr. Nguyen's claim against Mr. Wade between August and November. Patterson Dep. 115, App. 744. *Cf. Haugh*, 322 F.3d at 232–33 (reversing judgment in favor of insurer where plaintiff's refusal of a belated offer resulted from the substantial litigation costs attendant to the insurance company's delay); *Associated Wholesale Grocers*, 934 P.2d at 92 (recognizing that the risk and expense of a trial is relevant to plaintiff's willingness to negotiate). Nor has Appellant suggested any other legitimate reason why the policy-limits offer, which was good on August 20, was no longer good on November 1. *Cf. Adduci*, 424 N.E.2d at 649 (upholding dismissal of bad-faith claim where the evidence revealed no legitimate reason for the plaintiff to refuse a settlement offer forty days after the deadline).

Indeed, in his letter to EMCASCO rejecting its settlement offer, Mr. Graybill (a specialist in bad faith claims whom Mr. Patterson engaged as co-counsel in August, 2001) explained that Mr. Nguyen could not accept the policy-limit offer because "it appears a *prima facie* case can be made that [EMCASCO] is guilty of negligence or bad faith" based on its delay in offering to settle the claim, and that Mr. Nguyen hoped to "enforce Mr. Wade's rights in a lawsuit."

App. 833–34. It is therefore an admitted fact that Plaintiff's motive in refusing EMCASCO's settlement offer on November 1 was to set up a bad faith claim against the insurer.

Because the duty of good faith is an obligation arising from the contract itself, general principles of contract law apply, including the required elements of causation and damages. *Sours v. Russell*, 967 P.2d 348, 351–52 (Kan. Ct. App. 1998). Of particular relevance here is the Kansas Supreme Court's approval in *Hawkins v. Dennis* of the Kansas Court of Appeals' holding "that there must be a causal link between the insurer's conduct and the excess judgment against the insured." 905 P.2d 678, 690 (Kan. 1995) (citing *Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 804 P.2d 1012, 1021–22 (Kan. Ct. App. 1991)). Thus, an insured may recover under a bad-faith claim only for those excess judgment losses "directly and naturally resulting from the breach." *Sours*, 967 P.2d at 351. *See also Peckham*, 895 F.2d at 836 ("[W]e think it settled beyond serious question that, in order to warrant recovery for an insurer's bad faith anent settlement negotiations, it must be shown that the insurer's conduct caused the ensuing excess judgment."). There are a number of reasons why an insurer's delay in attempting to settle a claim might set up a natural and continuous sequence of events that causes a claimant to reject a policy-limits settlement offer that he would have accepted earlier. For example, a claimant who has invested time and resources preparing for trial might want the settlement agreement to reflect those

-33-

added expenses. *See Haugh*, 322 F.3d at 232–33. But if a claimant arbitrarily withdraws an initial settlement offer and later rejects an identical proposal from the insurer, the claimant's conduct is the legal cause of the failure to settle. *See Adduci*, 424 N.E.2d at 649 (holding that the court could not "fairly place the blame for failure of settlement upon Insurer" when the plaintiff did "not show why the offer would have been good on May 7, 1976, but was not acceptable on June 18, 1976"); *see also Snodgrass*, 804 P.2d at 1024 (rejecting a bad-faith claim against State Farm where the "only" purpose of the plaintiff's settlement offer was "as evidence to show the jury that State Farm rejected an offer").

The undisputed evidence shows that Mr. Nguyen's legal team rejected EMCASCO's November 1, 2001, settlement offer as part of a strategy to establish a bad faith claim against EMCASCO for its failure to settle the case earlier. Holding an insurance company liable for the excess judgment against the insured under these circumstances would be inconsistent with the cause of action for bad-faith or negligent refusal to settle. The cause of action for failure to settle is meant to protect the interests of the insured by requiring the insurer to conduct the litigation, including settlement negotiations, as if the insurance contract had no policy limits. *Bollinger*, 449 P.2d at 511. It is not meant to create an artificial incentive for third-party claimants to reject otherwise reasonable settlement offers that are within the policy limits. We would be turning the cause of action on its head by holding an insurance company liable where it eventually offered to settle

the claim for the policy limits, but a claimant rejected the offer precisely in order to manufacture a lawsuit against the insurer for bad-faith refusal to settle.

### III. Mr. Wade's Claims Against EMCASCO

Mr. Wade separately appeals the district court's grant of summary judgment in favor of EMCASCO on his breach of contract, breach of the duty of good faith, and fraud claims.[4]  We turn first to Mr. Wade's contract claims.

### A.    Breach of Contract and Good Faith Claims

Kansas law requires that every legal action be prosecuted by the real party in interest.  Kan. Stat. Ann. § 60-217(a).  In causes of action arising from a contract, only parties to the contract may enforce the contract because "the person who possesses the right sought to be enforced" is the real party in interest. *O'Donnell v. Fletcher*, 681 P.2d 1074, 1076 (Kan. Ct. App. 1984).  Kansas law, however, allows an injured party to assign his right to recovery under a contract to a third party.  *Alldritt v. Kan. Centennial Global Exposition, Inc.*, 371 P.2d 181, 187 (Kan. 1962) ("In this state all choses in action, except torts, are assignable.  Accordingly it has been held that a cause of action for damages for breach of contract is assignable." (citations omitted)).  Where the injured party assigns all of his rights to a third party, the assignee becomes the real party in

---

[4] Although Mr. Wade presented numerous tort claims to the district court, including negligence, fraud, breach of fiduciary duty, and tortious interference with contract, he appeals only the district court's grant of summary judgment on the fraud claim.

interest and the assignor can no longer pursue a claim on his own behalf. *See*

*Army Nat'l Bank v. Equity Developers, Inc.*, 774 P.2d 919, 932 (Kan. 1989); *First*

*Nat'l Bank of Topeka v. United Tel. Ass'n*, *Inc.*, 353 P.2d 963, 970 (Kan. 1960)

(explaining that "the assignee of an account [is] its legal holder" and therefore

"the proper representative of the account as against the debtor").

As part of the confession of judgment between Mr. Nguyen and Mr. Wade,

the two men entered into a "Covenant Not to Execute and Assignment of Rights."

App. 839–41. The agreement provided, in pertinent part:

> Wade assigns to Nguyen, his executors, administrators, legal
> representatives, agents, successors and assigns all of his rights
> flowing from any interest he may have giving rise to a claim against
> any insurer to pay damages Wade is legally obligated to pay Nguyen,
> including without limitation insurance policies issued by EMC.

*Id.* at 840. Once Mr. Wade assigned all of his contractual rights under his

insurance policy to Mr. Nguyen, Mr. Wade no longer possessed the right to

enforce the contract against EMCASCO. He is therefore not the real party in

interest and cannot maintain a cause of action against EMCASCO for breach of

contract or breach of the duty of good faith arising from the contract.

**B.     Fraud Claim**

Because tort claims are unassignable under Kansas law, Mr. Wade remains

the real party in interest for the fraud claim. His fraud claim, however, fails

under Kansas law because it is an impermissible attempt to recharacterize the

breach of contract claim and does not allege an independent tort.

-36-

To maintain a fraud claim under Kansas law, the basis of the claim must be different from the conduct upon which a breach of contract claim is based. *See Brown v. Chaffee*, 612 F.2d 497, 503 (10th Cir. 1979) (interpreting Kansas law and concluding "Brown cannot turn an action for breach of contract into an action for fraud by merely alleging reliance on representations that the contract would be performed and detriment from its breach"); *Heller v. Martin*, 782 P.2d 1241, 1245 (Kan. Ct. App. 1989). Furthermore, the fraud must have resulted in damages greater than those caused by the breach of contract alone. *Heller*, 782 P.2d at 1245; *cf. Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 652 P.2d 665, 668 (Kan. 1982) ("[T]here must be an independent tort resulting in additional injury before punitive damages can be recovered in a breach of an insurance contract action.").

Mr. Wade's allegations of fraud are indistinguishable from his breach of contract claims. Mr. Wade alleges, as the basis for his fraud claim, that EMCASCO intentionally misrepresented to Mr. Wade that Mr. Cooper would vigorously defend Mr. Wade against Mr. Nguyen's claim, despite EMCASCO's knowledge that Mr. Cooper would also consider EMCASCO's interests. EMCASCO's representation, however, was merely a statement that it would perform its obligation under Mr. Wade's insurance policy to defend Mr. Wade against any claims. Thus, Mr. Wade's fraud claim is merely a claim that EMCASCO breached its contractual duty to defend Mr. Wade against claims

-37-

arising from the accident and that Mr. Wade was injured by EMCASCO's failure to satisfy its contractual obligation. Such a claim sounds in breach of contract, not fraud. *See Brown*, 612 F.2d at 503; *Heller*, 782 P.2d at 1245.

Nor has Mr. Wade alleged fraud damages distinct from those arising from EMCASCO's breach of contract. In his Amended Petition, Mr. Wade claimed that EMCASCO's breach of contract caused "a judgment in excess of $3 million [to be] entered against [him]" and "prevented [him] from borrowing money secured by his home and . . . from selling his home." App. 319. Similarly, the damages that he claims arose from EMCASCO's alleged fraud were as follows: "a judgment in excess of $3 million [was] entered against him; he has been deprived of the benefits of his insurance policy; he has been and will be precluded from using his real estate as security for loans; he has been and will be prevented from buying or selling real estate." *Id.* at 325. The damages claimed under the breach of contract claim and the fraud claim are identical. The only additional injury Mr. Wade alleges in the fraud claim is that he was "deprived of the benefits of his insurance policy." *Id.* This injury directly relates to the contract, and damages arising from this injury were recoverable under the breach of contract claim. Because Mr. Wade has failed to allege an additional injury distinct from those caused by the breach of contract, he has failed to establish an independent tort of fraud.

## IV. Conclusion

For the foregoing reasons we **AFFIRM** the district court's grant of summary judgment in favor of EMCASCO on Mr. Nguyen's claim for bad-faith failure to settle as well as on Mr. Wade's claims for breach of contract, breach of the duty of good faith, and fraud.

**Wade v. EMCASCO, 05-3044 and 05-3054**

**Ebel**, Circuit Judge, Concurrence and Dissent

I join the majority opinion affirming summary judgment in favor of EMCASCO on the tort claims.

However, I would reverse summary judgment for EMCASCO on the contract claims, and would remand those claims for further consideration.  In my judgment, there are general disputes of material fact which preclude summary judgment for EMCASCO on the contract claims.